## The Bank of Kentucky *v.* The Schuylkill Bank.

When new events or new matters have occurred since the filing of an original bill, a supplemental bill is the proper mode of bringing them before the Court; for, generally, such facts cannot be introduced by way of amendment.

Such new matter, if introduced by way of amendment, instead of by way of supplemental bill, is demurrable.

To enable a complainant in equity to file a supplemental bill, introducing matters which have arisen since the filing of the original bill, the original bill must be one on which some valid decree could be made by the Court. If wholly defective, it cannot be made the basis of a supplemental bill ; for if the complainant had no ground for proceeding originally, he should file a new bill, showing a cause entitling him to relief. But if his original bill was sufficient to entitle him to one kind of relief, and facts subsequently occur which entitle him to other and more extensive relief, he may have it by setting out such new matter in the form of a supplemental bill.

As a general rule, every principal is held liable to third persons, in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, or other misfeasances and omissions of duty, of his agents in the course of his employment; although the principal did not authorize, or justify, or participate in, or know of such misconduct; or even if he forbade or disapproved of the same.

In all such cases the principal holds out his agent as competent·and fit to be trusted; and thereby, in effect, warrants his fidelity and good conduct in all matters of the agency.

Generally, the acceptance of the office of agent implies an obligation to keep the principal indemnified from all unauthorized acts committed under colour of the agency.

If an objection is interposed to a supplemental bill, that it had no sufficient basis disclosed in the original, it must be done by way of demurrer, or, at least, the defendant should have insisted on, and claimed the benefit of this exception in his answer.

It is a general rule, that, for breaches of contract, and other wrongs and injuries cognisable at law, equity does not entertain jurisdiction to give redress by way of compensation or damages, when these constitute the sole object of the bill; there being in such cases a plain, complete, and adequate remedy at law. When, however, compensation or damages are incidental to relief, the jurisdiction attaches in equity as inseparable from proper relief. It is where no other claim for relief is presented, and where the remedy at law is plain, direct, and unembarrassed by any complexity in the subject-matter of the claim for compensation or damages, that the jurisdiction in equity becomes questionable.

Compensation or damages do not ordinarily attach in equity, except as ancillary to a specific performance, or some other relief. If it does attach in any other cases, it must be under very special circumstances, and upon peculiar equities ; such as cases of *fraud*, or when the party has disabled himself by matters *ex post facto* from a specific performance; or in cases where there is no adequate remedy at law.

The want of an adequate remedy at law gives jurisdiction to a Court of Equity and a claim to relief. Where there is a plain, complete, and adequate remedy at law, equitable jurisdiction must fail. It is not, however, enough that there is a remedy at law; it must be *plain* and *adequate*, as practical and efficient to the ends of justice and its prompt administration, as the remedy in equity.

Where the remedy at law would necessarily lead to the multiplication of suits, and the increase of useless and burdensome litigation, equity maintains its jurisdiction. The peculiar character of the parties, as well as the peculiar nature of the claim, may make the controversy the proper subject of equitable cognisance.

Where principals demand an account and discovery of an agent, a bill will lie for an account, and they may apply to a Court of Equity for that purpose. So, when *fraud* is charged in the bill, a Court of Equity has jurisdiction, and, it is said, upon the ground that such transactions are coupled with a trust.

The objection to the jurisdiction of a Court of Equity, because the complainant has an adequate remedy at law, cannot regularly be taken by a defendant after he has answered on the merits. After a defendant has put in an answer in chancery, submitting himself to the jurisdiction of the Court without objection, it is too late to insist that the complainant has a perfect remedy at law, unless the Court is wholly incompetent to grant the relief sought by the bill.

A law operating on the remedy for a breach of contract, and in no respect affecting the contract itself, is constitutional. The legislature, from time to time, may provide new remedies, modify old ones, validate defects in form, provide new tribunals or new process for vindicating existing rights ; and such enactments are perfect within the limits of the state and national constitutions.

Under the Constitution of Pennsylvania, the legislature can authorize the existing Courts to grant relief in equity, and from time to time enlarge or diminish those powers, or vest them in other Courts, in such way as they deem proper for the due administration of justice.

By the comity of nations, foreign corporations are permitted to make contracts within their jurisdictions, when they are not contrary to the known policy of the state, or injurious to its interests. Such is the usual comity of recognising the laws of another state.

A corporation can make no contracts and do no acts within or without the state which creates it, except such as are authorized by its charter ; and those acts must be done by such officers and agents, and in such manner as the charter authorizes.

When the tribunals of the state creating a corporation have adjudicated on the extent of the franchises possessed by such corporation, a spirit of comity requires that such adjudication should conclude the question of the amount of its charter privileges in a foreign forum, when it is a suitor. It belongs to the government by which it was created to judge its powers and determine when it has forfeited its chartered privileges ; and 'it is not for a foreign court collaterally to decide upon the question of misuser, or the forfeiture of its chartered rights, no more than to decide upon the validity of any other local law of that state.

A corporation, being a mere creature of the law, possesses only those faculties which are imparted to it by the charter of its creation, either expressly or impliedly, as necessary to its existence. Implied are, however, as much granted as express powers. If a banking or other corporation could do no act except such as is in terms prescribed in its charter, its movements, for all practical purposes, would not last for a day. By the grant of a bank or other charter, all the incidental and necessary faculties required to carry the expressly granted powers into effect, are implied.

All claims of corporate power derived from implication require close scrutiny ; but, in the nature of things, they must exist; and their liability to abuse affords, legitimately, only reasons for their cautious recognition. Charters of incorporation are constitutions, not codes.

The directors of a bank are but its authorized agents, and they can incur no

Q

obligation binding on the corporation except while acting in the mode prescribed by, and within the limits of the charter. The corporation is altogether a distinct body from the directors. They are made the representatives of the corporation, with plenary power to regulate its concerns according to their best discretion and judgment.

The cashier of a bank is a statute officer, not of the directory, but of the corporation, lawfully empowered to carry the contracts of the corporation into execution, as the directors are lawfully authorized to make them, when acting within the sphere of their authority derived from the corporation. While a bank corporation is compelled, by the incorporeal nature of its essence, to act by others, yet, when these are a part of its organic machinery, like its cashier, it is as much responsible for their omissions, as is a natural person, who employs assistants in the execution of any commission. A corporation can no more contain within itself the function of a primary and secondary agent, than can a natural person. The cashier is the executive officer of a bank. Though chosen by the directors, he is as much the statute agent of the corporation as the directors themselves. Therefore the acts and doings of a cashier, carrying into execution a lawful contract entered into by the bank, that is, by its board of directors, are the acts and doings of the bank itself, for which the corporation is responsible to all parties aggrieved by them. The *criteria* of the liability of principals for agents, are, simply, that the act was done in the exercise and within the limits of the powers delegated.

No act of a corporation can enlarge its chartered authority, either as to the subjects on which it is intended to operate, or the property of the corporation. If created with a fund limited by the act, it cannot enlarge or diminish the fund but by a license from the legislature.

It is a universal rule in the law of agency, that, in order to bind a principal upon a contract made by an agent, the contract must be within the authority committed to the agent; and the authority must be strictly followed. The principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters of the agency.

It is firmly settled, that a corporation may be bound by a promise expressed or implied, resulting from the acts of its authorized agents, although such authority be only by virtue of a corporate vote, unaccompanied with the corporate seal. The same presumptions which apply to private persons, are applicable to corporations. Hence, a vote of a corporation may be presumed from other acts, though there is no proof of such vote on the corporate record. For the omission of the corporation to record its own doings cannot prejudice the rights of a party relying upon the good faith of an actual vote of the corporation. Such presumptions are equally admissible, whether operating for or against a corporation.

Corporations are liable for the frauds and torts of their servants and agents, done in the course of their employment, in the same manner as individuals are responsible for the acts of their servants touching their business.

*Jan.* 28. THIS was a bill in equity, brought by the Bank of Kentucky *v.* The Schuylkill Bank, in the city of Philadelphia, and Hosea J. Levis. The original bill was filed on the 17th of December, 1839. On the 13th of June, 1842, an act of the legislature of this state was passed, giving the Bank of Kentucky authority to proceed in equity in the Court of Common Pleas of Philadelphia, against the Schuylkill Bank, and such other persons as the

complainant might choose, either by a new original bill, or by amending and enlarging the bill then pending, for the purpose of settling the controversy between the parties, in relation to certain alleged excessive issues of certificates of stock, purporting to have been issued by the Bank of Kentucky; and for all accounts between the banks, and other matters set forth in said law; also giving to said Court cognisance of said cause in equity, with full authority to hear and determine the controversies between the parties, and give relief as to justice and equity would appertain; to make all necessary orders and decrees, after the manner and course of a Court of Equity, with authority to make a final decree thereon. The Act referred to will be found in the Pamphlet Laws of 1842, p. 279.

The original bill was very brief, prepared and filed when it was supposed the Schuylkill Bank might possibly dispose of its assets, and but imperfectly set forth the real ground of complaint. There was a short statement of the equity of the plaintiffs' claim, but as the whole subject is more fully set forth in the amended bill, in much more regular form, it is not deemed important to state these matters at large. There was a prayer for a discovery, for a surrender up of all money held by them of the complainants, together with the certificates, and to disclose to whom they had been issued; and that the defendants be compelled to account to the complainants for all liabilities to which the Bank of Kentucky might be subjected by the alleged over issue of stock.

The bill also prayed for an injunction against the respondents' parting with the possession of the funds obtained by the transfer of stock, and controlled by them, derived from the fraudulent issue of stock, until the threatened loss by the fraudulent issue, more fully stated in the supplemental bill, was ascertained and supplied. An injunction was issued, and the whole assets of the bank placed under the control and direction of the Court.

After the passage of the Act of 1842, other counsel appeared and filed an amended and supplemental bill, which more fully discloses the cause of complaint, and is substantially as follows: That the plaintiffs, by the name and style of the Bank of Kentucky, on or about the 17th day of December, A. D. 1839, exhibited their original bill of complaint against the Schuylkill Bank and Hosea J. Levis, which said original bill contained various statements, charges, and prayers, as by reference thereto would more fully and at large appear, and, by way of amendment and supplement thereto, complain,

That they are a corporation for banking purposes created by an Act of the legislature of Kentucky, approved the 22d of February, 1834; and also refer to a certified copy of the law as an exhibit to the bill. That the subscription books for the stock were opened by the commissioners named in the Act, and the stock was subscribed; also that the bank was legally organized.

That, under the provisions of the charter, and to carry out the 26th section thereof, the Bank of Kentucky passed the 12th article of their by-laws, a copy of which was annexed to the bill, and made a part thereof, which was, that the stock of the bank shall be assignable and transferrable at the bank in Louisville, and in other places where the bank shall appoint agents for this purpose, personally by the stockholder, or by his attorney, upon the surrender of the certificate thereof.

That afterwards, on the 3d day of February, 1835, at a meeting of the Board of Directors of the Bank of Kentucky, a resolution was adopted and recorded, as follows: "*Resolved*, that the President and Cashier be authorized to establish transfer agencies in New York, Philadelphia, and New Orleans, under the by-laws relating to the transfer of stocks." That, in pursuance of said resolution, the President of said bank, with the approbation of the Cashier, wrote to Messrs. Riddle & Robert, of Philadelphia (a copy of the letter was annexed to the bill), stating that the Board of Directors had instructed him to establish agencies in New York, New Orleans, and Philadelphia, for the convenience of stockholders in the Bank of Kentucky. He enclosed the form and manner of effecting such transfers; and, not knowing whether the Schuylkill Bank would accept the agency, he left the name in the address of the letter or form enclosed, blank, for them to fill up. And the bill averred that those gentleman did fill up the blank with the name of the Schuylkill Bank; and a copy of the said letter and instructions was also annexed to the bill. Another letter was afterwards written to the same gentlemen, stating more fully the manner of negotiating the transfer of stock in Philadelphia and New York, a copy of which was attached to the bill, not important to be reported. The bill also charged that, afterwards, the complainants received a letter from the Schuylkill Bank, a copy of which was annexed to the bill.

This letter is referred to in the opinion of the Court. It was then averred that this letter was received by the complainants, and the offer of agency accepted by the Bank of Kentucky, at a meeting of the Board of Directors; and that, in pursuance of the agreement

and understanding of the parties as expressed in the letters and resolution of the Board of Directors, the Schuylkill Bank became the transfer agent of the Bank of Kentucky in Philadelphia for the transfer of stock.   That the Schuylkill Bank opened a stock ledger, book of transfer, assumed and undertook to perform the trust of such agency according to law, and the authority given them by the complainants, and in equity and good conscience.   As a compensation for the transaction of the business, they agreed to pay the Schuylkill Bank, and did pay, the sum of $500 per annum.

It was further averred that, by the authority conferred on the Schuylkill Bank, it could only place on the stock ledger kept by said bank, the shares of stock originally subscribed on the commissioners' books in Philadelphia, and those transferred by warrants from the principal bank at Louisville, or from the transfer agency of said bank, established at the Union Bank in New York.   It was also charged that the Schuylkill Bank proceeded, in pursuance of said appointment, after opening the books of the agency as aforesaid, to accept surrenders of the scrip issued by the commissioners for the subscription of stock on their books in Philadelphia; and to issue certificates to such subscribers or their transferees, in which they styled themselves the agent of the Bank of Kentucky.   The bill then set forth a copy of the form.   It was also averred that these certificates were always signed by the President of the Schuylkill Bank, or the Cashier thereof, and were sometimes under the seal of the bank, and sometimes not.   That the agency kept a stock ledger, and in it an account was opened with each stockholder, in which he was credited with the number of shares held by him, and the Bank of Kentucky made debtor for the same. When transfers were made of any part of his stock, he was debited with the same in the ledger account, and when he had transferred all, the account in the same way was balanced.   The bill further stated all the process by which the accounts were kept, and made known to the parent bank; and then averred that, had the Schuylkill Bank acted faithfully, and according to their trust and duty as the transfer agent, no one could or would have been permitted to transfer stock when there was no stock, to his credit on the books The complainants stated that it was believed that for a long time the defendants acted faithfully in their trust as transfer agents, and kept the books correctly.   But on the 16th day of December, 1839, when the transfer books were about to be given to another agent, by order of the Bank of Kentucky, it was discovered that the Schuylkill Bank had, contrary to their trust and duty, made, or

24                              Q 2

suffered to be made, an over issue of the certificates of shares of stock of the Bank of Kentucky to a very large amount.

The complainants further stated, that the transfer books kept by the Schuylkill Bank for the Bank of Kentucky, exhibited the fact, that various persons were permitted by the former to transfer shares, purporting to be shares of the Bank of Kentucky, when they had none on the books, and no authority from those that had such stock; and they were charged with the amount so transferred on the stock ledger. The bill stated the names of various persons who had thus made the transfers, to the amount of 2877 shares, and also charged that the Schuylkill Bank permitted H. J. Levis, their then Cashier, to transfer 13,374 shares, when he held none, nor had he any authority from those who did; also, to issue certificates or transfer warrants for the same; and open accounts on the stock ledger with persons to whom they were transferred, giving them credit therefor.

The bill charged that the ledger was accessible to the various directors of the Schuylkill Bank, and bore evidence of being much used. The bill also charged that after the discovery of the over issue, an individual surrendered 447 shares, which he acknowledged he had never paid for, leaving outstanding of this over issue of certificates, purporting to be shares of the stock of the Bank of Kentucky, 12,997 shares. That parts of this over issued stock was taken from the agency in Philadelphia to the agency in New York, and the transfer warrants there surrendered to that agency, and the shares placed on the stock ledger of that agency, to the credit of the holders, and also transferred from the agency of the Schuylkill Bank to the bank at Louisville, and the transfer warrants were there surrendered to this bank, and the shares placed to the credit of the holders on the stock ledger kept at this bank.

It was further averred in the bill, that the over issued shares, so placed on the stock ledger kept at the agency in New York, and in the stock ledger kept at Louisville, were transferred from one person to another in the same way as the genuine stock; but that the complainants aver it was not known by the Bank of Kentucky, or the Union Bank, that there were any certificates of shares or any transfer warrants of the character above described, issued by the Schuylkill Bank, and the affair was so managed as to prevent any suspicion on the part of either bank.

The bill then stated the amount of the capital stock of the bank of the plaintiffs, and its division into shares, and the number of shares. That they were advised, after the discovery of the spurious issue, to endeavour to separate the genuine from the spurious issues

of certificates of shares.  The bill then states the efforts which were made to accomplish it, and that it was found impracticable, to separate them, and plaintiffs were driven to an arrangement hereafter stated.  It further stated, that the transfer books, as kept by the Schuylkill Bank, exhibit the fact that this over issue of certificates was made by that bank, and its officers and agents, and must have been known to all concerned in the administration and direction of the Schuylkill Bank, if ordinary attention was paid, from the manner in which the books were kept, and the business transacted. The bill also avers that this over issue was made *for the use and benefit of the Schuylkill Bank,* and the greater part of it sold, and the proceeds thereof used and appropriated to their own purposes.  That the bank was largely indebted, and threatened with insolvency, when the sales of these spurious shares were made, and the Cashier, in most instances, transferred these shares to brokers for sale, and when sold, the proceeds of the sale went directly and immediately into the Schuylkill Bank, and were applied to the payment of debts and liabilities against said bank.  The bill also averred that the entries in the books of said bank would prove and establish these allegations.

The bill also stated that when the over issue was first ascertained, there was standing to the individual credit of Levis, who was then the President of the Bank, a sum exceeding $300,000 ; that, on the day of such discovery, Levis resigned his office, and drew his check for this large sum, by which means the Schuylkill Bank possessed themselves of that amount, and have applied it to the use of the bank.  That the bank then caused Levis to make an assignment of his effects and property for the benefit of said bank; which has, from the property so assigned, realized large sums of money, which they have also appropriated to their own use. And at the time Levis resigned and made the assignment as aforesaid, he declared repeatedly that the issues of the spurious stock were made, and the stock sold, to raise money to get the Schuylkill Bank out of their embarrassments, and that the whole proceeds were applied to that object, and not one cent to his individual use; and such a declaration was spread on the minutes of the Schuylkill Bank; and that, after he absconded, he made two depositions to the same effect, which are in the possession of the Schuylkill Bank.

The bill further stated, that, since the filing of their original bill, the holders of these spurious certificates of shares have claimed to be stockholders in the Bank of Kentucky, and to participate in the direction and profits of said bank, and have refused, and still do

refuse, to look to the Schuylkill Bank for the money paid for said shares; and moreover allege that their title is confirmed by having received dividends on said shares up to the 1st of July, 1839; and if they are not shareholders in the Bank of Kentucky, and, as such, entitled to participate in the direction and profits of the bank, that the Bank of Kentucky is liable to them for the amount of money paid for the shares held by them, with interest on the same, because the complainants are accountable for the conduct of their agent, the Schuylkill Bank, in issuing these certificates; and that the complainants were actually sued in the Court of Chancery in Kentucky, for the same, by a Mr. Thomas, the holder of thirty-eight shares of the said spurious issue; that another suit has been commenced by another individual, and they are threatened with more. The bill charged the defendants with the payment of dividends on the spurious stock, down to July, 1839, as one of the means by which the over issue was concealed from the knowledge of the Bank of Kentucky; and that the Schuylkill Bank so kept the books of their agency that they were unable to distinguish the real amount of the actual or genuine stock, and made their reports to the principal bank accordingly, and thus escaped the detection which would inevitably have ensued, had they reported the whole amount of their issues.

The complainants state that, in consequence of the premises, infinite embarrassments were produced; they were prevented from declaring dividends; in short, the whole business of the institution was virtually destroyed, and they exposed to endless litigation, of doubtful result. Under these circumstances, the legislature of Kentucky, by certain Acts of Assembly, passed in 1842, authorized said bank to enlarge its stock, whereby the complainants were also empowered to purchase the stock of said bank, and exchange it for the said certificates of over issues, or claims to shares having their origin in such over issue, in the hands of innocent purchasers without notice. That, acting under the authority of said Act, the Bank of Kentucky has purchased certain of said over issues of certificates or claims in the hands of innocent purchasers without notice, according to the provisions of said Act, and that they are ready and willing to do the like in all other such cases, and crave leave to show to the Court the extent of the purchases so by them made. The complainants also claim that, under and by virtue of the Act of Assembly of this state, passed the 13th of June, 1842, above referred to, they are to be considered in this amended and supplemental bill of complaint, as representing all the holders of

said spurious stock, and as suing not only for their own use, but also for the use of the said holders under the reservations in said Act mentioned; and the plaintiffs claimed to represent the holders of said spurious stock accordingly.

The bill charged the insolvency of the bank, and that it was so, when Levis was appointed the Cashier, but that fact was unknown to plaintiffs. It also charged that, in paying the dividends on the Kentucky stock at the Schuylkill Bank, one sort of check was used to pay dividends made on the genuine stock, and another to pay the supposed dividends on the excessive issue of shares, and this was known to many, or all the officers of the Schuylkill Bank. The complainants averred that, in addition to their loss in being compelled to assume the spurious stock, they had suffered great detriment and loss by the long interruption and suspension of their banking business, in their attempt to separate the genuine from the spurious stock, which the defendants ought to refund. Also that they had applied to the Schuylkill Bank to aid in the ascertaining the *bonâ fide* holders of the spurious shares of stock, but the defendants had not complied with their request.

The bill also charged fraud and combination between Levis and the bank to injure the complainants. It then prayed, that the defendants might be required to answer the various interrogatories in the bill, forty-four in number. Also for an inquiry, under the direction of the Court, as to the quantity of the stock of the over issue, and how much was in the hands of *bonâ fide* holders for value. The complainants further prayed for an account, and for a decree against the defendants for the par value of the stock thus surreptitiously issued, with interest thereon, and also for the damages the plaintiffs had sustained, and also for other and further relief.

The respondents filed a well drawn answer to the bill, admitting nothing but what appeared upon the records of the corporation, and the passage of the various Acts of Assembly, and the letters, so far as copies appeared upon the letter-book of the bank, and those received, which were among its files. There was a plain, direct, and positive denial of the agency by the Schuylkill Bank, and an assertion, that if Levis acted as the transfer agent of the Kentucky Bank, it was in his individual capacity, and not by the authority of the respondents. There was a direct denial of all the equity of the bill, and any fraud or combination on the part of the respondents; also of the averment, that the bank had received the proceeds of the spurious issues of stock; and alleged, if money was

received therefrom, it was applied by Levis to his own use, and not to the business of the bank. They also stated ignorance of many things averred in the bill; neither admitting nor denying many matters charged as to the conduct of Levis. The answer denied that the respondents had ever authorized any one to become the transfer agent of the stock of the Kentucky Bank; and asserted, as a corporation, they could not become such transfer agent, and never did. The answer contained a denial of all knowledge of such agency, or connexion with the same; and that Levis, as their Cashier, had no authority to carry on any dealings or business, except those prescribed by the directors of the bank, and its daily business.

The answer denied that any contract of agency could be implied from the extended correspondence attached to the bill and answer, which was set forth at large.

The answer averred, that all the correspondence which had been carried on by Levis with the Bank of Kentucky, was without the authority of the respondents.

It was denied in the answer that the Schuylkill Bank had ever accepted the surrender of scrip, or given certificates of stock to subscribers or their transferees. There was a denial in the answer of the respondent's knowledge of the books of the agency. There was also contained in the answer an extended statement of facts in relation to the conduct of the complainants, relative to the transfers of stock, and the conduct of Levis in relation to the same, which, it was averred, had transpired without the cognisance or assent of the respondents. In short, there was nothing admitted or conceded in the answer as to the facts material in the issue. Many matters were stated by way of defence, but, as all the legal propositions which arise in the cause are so fully stated by the Judge who delivered the opinion of the Court, it is not deemed essential for a clear understanding of the case more fully to state them.

The reporter had prepared a much more extended outline of the bill, and a full statement of the answer; but the report of the case occupying so much space, he was compelled to withhold its publication.

It is believed that the short extracts from the bill and answer set forth with sufficient clearness the main points of controversy in the cause, so that the reader will fully comprehend the decision of the Court on the same, without any report of the testimony; which was very voluminous, occupying more than four hundred printed

pages in the paper-book.   To attempt even a synopsis of it would too greatly extend this already lengthened report of the case.

It was argued by Messrs. *Gerhard, F. W. Hubbell,* and *John Sergeant,* for the complainants, and Messrs. *R. Hare,* Jr., *H. J. Williams,* and *G. M. Dallas,* for the respondents.

More than twenty days were consumed in the hearing, therefore but a very brief report can be given of the very able and lucid arguments of the gentlemen who discussed the cause.   The points made, and the authorities cited, are the most that can be noticed.

Mr. *Gerhard* commenced his address to the Court, by giving a minute and detailed statement of all the facts on which the plaintiffs would rely to sustain their cause : referring to a lengthy correspondence between the officers of the banks ; the manner in which the agency began, how it was conducted, and when ; the whole conduct of Levis, and the knowledge which the Schuylkill Bank had of the agency ; the evidence which tended to prove that the bank was the agent of his clients for the sale and transfer of the stock ; the fraud practised by Levis, the payment of dividends, and the amount of spurious stock which had been issued and retired by the Bank of Kentucky ; and the clear evidences to show that the officers of the Schuylkill Bank assumed the agency officially, and that Levis acted for the bank, and not individually.

He also presented clearly the evidences that went, not only to prove the agency of the Schuylkill Bank, but that the proceeds of the spurious stock went into the funds of that institution.   He read and commented fully upon the oral testimony presented by depositions, which were very voluminous, and clearly presented all the facts in the cause, which tended to sustain the allegations in the bill.   He also stated fully the points on which the plaintiffs relied for a recovery ; and read the documentary evidence arising from the books of the bank, and commented fully upon the evidence to establish the agency of the Schuylkill Bank and its liability.

Mr. *Hare* opened for the defendants, and pointed out what he conceived *not* to be evidence, and adverted fully to the evidence produced by the respondents to rebut the allegation of the agency of the Schuylkill Bank, and denied that any of the proceeds of the spurious stock had ever been received by the Schuylkill Bank, and the principal allegations made by the plaintiffs.   He also commented fully upon the testimony adduced by the plaintiffs, and

referred minutely to all the evidence produced by the respondents. He then contended that the bill filed by the plaintiffs on the 17th of December, 1839, shows no right of action. That the bill last filed was not a supplemental, but that it was a new one, as much so as if it had been against new parties, or a different bank. That the Act of 1842 gave no right to file such a bill; also that the holders of the stock had no claim against the Schuylkill Bank, and therefore the plaintiffs had none; and cited 2 Madd. Rep. 372; Mitford, 75.

He stated that they appeared as representing the corporators, not for the Directors, and alleged that the corporators were bound for nothing but the legal acts of their agents.

He contended that the corporators were innocent parties who had wronged no one. That the Bank of Kentucky had placed confidence in Levis, and therefore must take the consequences. That the corporation he represented could not by law be an agent for the purposes set forth in the bill, nor any other purpose.

He also said the plaintiffs were not originally liable for the spurious issue of stock; and had only been made so by the Act of 1842, but that would not affect the respondents. The plaintiffs originally had no equity, and the Act could not help them. That, if the original bill was defective, it could not be aided by a supplemental bill; and cited Story's Equity Pleas, 332; 2 Madd. 519, 20, 21; Mitf. 61, 62; 1 Paige, 160, 200; 2 Simons, 419; 2 Madd. 453.

He argued that the defendants, being a corporation, could not be an agent, and cited Bank v. Barrington, 2 Penna. Rep. 27; Mechanics' Bank v. Bank of Columbia, 5 Wheat. 337; 8 Mass. Rep. 292; Forster v. Bank, 17 Mass. 505; 8 Wheaton, 360; 1 Munroe, 179; 19 Pick. 516, 517; Story on Agency, 252–260; 3 Watts, 256; 4 Wheat. 482; 10 Watts, 397.

He admitted that the tendency of the law was to place corporations and natural persons in the same relation; but this was only for corporate acts: U. S. v. Dundass, 12 Wheat. He contended such an agency was a violation of the Acts of 1808, and 1810; 5 Smith, 108. For the construction of this and similar laws: 2 Randolph, 465. Also, if the agency was not for banking purposes, it was a violation of the charter and the rights of the corporators: 7 Wend. 112; 1 Paige, 214; Angell & Ames, 66, 192–202; 4 Kent, § 10; 9 S. & R. 102; 1 Wend. 56; 15 John. 358; 19 Ib. 1; 2 Ib. 109; 7 Cowen, 606; 5 Term R. 792; 9 Watts, 550; 4 Wheat. 636.

He next contended, if the Schuylkill Bank could not be an agent,

the defendants were not responsible for the acts of Levis; and cited Bellmyer v. Bank, 4 Wheaton, 112; 14 Mass. 58; Angell & Ames, 250; Paley on Agency, 17; 1 Strange, 680; Story on Agency, 201; Foster v. Preston, 8 Cowen, 198.

Supposing the defendants to have been agents, they were not guilty of negligence, for both parties had confidence in Levis: Paley on Agency, 6, 77, 78; Story on Bail. 173, note (a); 4 John. Rep. 389; Story on Agency, 201, 202; 9 Mod. 349; 1 Edward C. R. 513; 14 Eng. C. L. R. 349; 6 Eng. C. L. R. 259–60; Story's Equity, 72, 184; Story's Equity Pl. 794, 472.

*Mr. Hubbell* read the Act of 1842, and contended that the objections now made, by way of argument, against the bill, should have been adduced by way of demurrer. Said the Act was complete, and covered all the objections now made by defendants' counsel. By this Act, the Court is constituted a Court of Equity, for the purpose of deciding this cause. It has made this claim the subject for the jurisdiction of a Court of Equity. All objections to supplemental bills, and amended bills, are closed by the Act. The legislature intended to give a remedy, without technical forms, adequate to the injury done the plaintiffs. The combined wrongs and rights of the party are united in the bill; the rights and wrongs of all stockholders and corporators, of genuine and spurious stock, now seek for justice. He spoke of the deep interest the community had in the result. He then remarked upon the agency and the evidence to establish it, of the correspondence and the facts which connected the bank with it, and the action of Levis in the matter.

All the facts were fully commented upon which went to establish the agency of the bank, and to show that all which Levis had done was known to the bank, and that the proceeds of the sale of the spurious stock were used for the benefit of the Schuylkill Bank, as alleged in the bill. He then spoke of the fraud which had been practised upon the plaintiffs, and said it has been contended there is no equity in the bill. The Act of Assembly makes it a subject of equitable cognisance in terms. If called upon to point out a head of equity, *fraud* would give the Court jurisdiction; and cited Story's Com. Equity, ch. 189, § 104. But as the plaintiffs could could not charge the corporators with the fraud, we charge it upon the officers. He contended the answer was evidence as far as the plaintiffs chose to use it; and cited Bank v. Gregory, 5 Peters, 97; 1 Paige, 311. He contended that the President and Directors

25                    R

are the corporation; and that the plaintiffs were not to look to a form so vague and indefinite as stockholders; cited 5 W. & S. 215. He contended that the agency of the Schuylkill Bank was complete, although no formal act of the board was shown accepting it. The minutes of the board would be but evidence of the acts of the corporation, but they are not the only evidence of the doings of the corporators as to third persons: Bank of the U. S. v. Dundridge, 12 Wheaton, 68, 74. These minutes are high evidence of the acts and doings of the corporation, but not the only evidence; other acts and doings may be equally efficacious for this purpose: 3 S. & R. 117. The acts of a corporate body may be inferred from concurring facts: 1 Watts, 385; Angell & Ames on Corp. 174.

It is said that the corporation was incapable of being a transfer agent. What forbids it? That such are the duties performed by other banks is clearly shown from the evidence.

It is the practice in great commercial cities; it is subsidiary to the purpose of banking; it is a part of the legal exercise of the functions of a bank; it is a power necessary and proper to convey other granted powers with its creation, and is impliedly, if not expressly, given by the charter; it is one of the essential functions of a bank to collect money, to deal in exchanges.

It has been contended that, admitting the Schuylkill Bank was the agent in the transfer of stock, the plaintiffs must look to Levis, as the defendants are not responsible for his delinquencies; for it was necessary to employ sub-agents. But the case of the Essex Bank v. Foster, 17 Mass. 479, settles this point, and we adopt it as the law establishing the present case. We contend that the officers of the bank constitute the bank, and are employed to uphold it; and that a corporation cannot contain within itself the features of principal and agent, any more than a natural person. That this was not a voluntary agency, but a specific salary was given for the performance of the duties, and that the wrong done was in the direct course of the agency. The Cashier, President, and Directors are not separate and independent agents, as has been argued; they are a congress of authorities, the aggregation of which forms what is called a corporation: 5 Wheaton, 326; 13 John. 341; 18 John. 341.

We contend there was an agency established; and being general agents, the bank is liable for all the acts of the officers: Story on Agency, 18; 2 Hill, 451.

It has been contended that a sub-agency in this case has inter-

posed. Still the principal agent is liable: 20 John. 380; 1 Martin, 365; 7 Ib. 461; 1 Louis Cond. Rep. 587; Paley on Agency, 15; Chestnut Hill *v.* Rutter, 4 S. & R. 16.

The doctrine that a corporation can only through its agents do right, and is not responsible for its wrongs, is exploded: M'Creedy *v.* Thomas, 9 S. & R. 94; 16 East, 6; 5 Wheat. 326.

Mr. *Hubbell* also contended that the bill contained every important and necessary charge in the case, and was right in form. That it asked for a discovery. It prayed an inquiry into the transfer of the stock, and that an account be taken; and charged a direct *fraud*, under which head of equity it could be sustained; and also urged that the answer amounted only to a denial of the agency.

Mr. *Williams*, for the defendants, said:—

We do not represent the Directors of the bank; we represent the stockholders of the Schuylkill Bank, who have been as much injured as the Bank of Kentucky by the frauds of Levis. The plaintiffs came to make profit, and constituted the agencies for their own advantages, and must take the loss. The Bank of Kentucky gave Levis the power to do the wrong, by leaving the cancelled certificates in his hands, in receiving them back, and issuing others in their stead.

We contend the bill exhibits no case over which a Court of Equity possesses jurisdiction. Secondly, that, on the filing of this bill, no right to sue existed in the complainants, either in their own right, or as representatives of the holders. If by any possibility they could have any cause of action against the Schuylkill Bank, it would be for the faults of an agent of their own, for which it is alleged the Schuylkill Bank are in some way responsible.

The bill exhibits no case over which a Court of Equity has jurisdiction. 1. Because there is no prayer to be relieved from any contract. 2. No contract is asked to be set aside; no fraud prevented; no mistake rectified; no accident remedied. All that is asked in terms is, that the Schuylkill Bank pay the loss and damage sustained by the mere administration of an agency. It is a claim for damages.

It is denied by the answer that the complainants have any right to sue. This must be shown. At the time of the filing of the bill, no right existed in the plaintiffs to sue, either in their own right, or as representatives of the spurious stock.

The Bank of Kentucky, at the filing of the bill, had no claim in

their own right against the Schuylkill Bank. They were not liable for the acts of the latter; suffered no injury, nor lost no valuable thing; and had no cause of action; they were not responsible over to third persons for the spurious stock. The injury done was to the individual takers of the stock, not to them. Before they could have a claim, they must not only have incurred a liability, but been by operation of law made responsible. The holders of such stock have no claim against them. The Act of the legislature of Kentucky could give no authority to enlarge their capital so as to embrace this stock. The bank could not increase their capital; nor could the act of Levis, their agent, so increase it as to give those to whom the stock issued a participation in the stock of the corporation : 5 Taunt. 792 ; 6 Pick. 23, 32 ; 15 John. 383.

Even admitting that the Schuylkill Bank or Levis were guilty of the fraud in the over issue of the stock, the Bank of Kentucky are not responsible for their defaults; for they had a special authority given them, to which the purchasers were bound to look, and see that it was not transcended.

The agent of a corporation can derive no authority except *colore officii*, or by some special authority expressly given him. And it is denied in the bill that the agent had any authority to issue the stock. A cashier cannot act *ex colore officii* as a transfer agent. As the cashier of a bank cannot act *ratione officii*, he must act by some special authority imparted to him by the Bank of Kentucky, or the Schuylkill Bank for the Bank of Kentucky. A corporation can appoint an agent in no other way than by a vote, or by seal. Such agent acts in pursuance of his authority derived from the corporation, which, of course, can only be within the charter. All who deal with the agent of a corporation are bound to know of the charter of the constituent corporation, and that the functions imparted to him are such as the corporation can impart. Levis, *colore officii*, derived no functions as corporation agent from the bank where he acted as Cashier, to be this transfer agent : Story on Agency, § 72, p. 85.

A corporation could not appoint an agent but by its by-laws, and the parties were bound to look to his appointment : 6 Maule & Sel. 14 ; 7 B. & C. 278, 283 ; 3 Hill, 362, 271 ; 3 Term Rep. 757 ; 5 W. & S. 550 ; 21 Eng. C. L. R. 162. The principle contended for is, that parties dealing with special agents, and admonished of the qualification of their authority, are bound to see the extent of such qualifications : 13 East, 432 ; Story on Agency, § 224, p. 266–7 ; 10 Mass. 403.

We think it has been shown that the Bank of Kentucky could not be made responsible to the holders of the spurious stock, as debtor; and her assumption of a responsibility to which she was not liable, can never create a remedy against us. Nor could she, as assignee of the original holders, have any such claim. They have no privity with the Bank of Kentucky nor the Schuylkill Bank.

Suppose the Bank of Kentucky to have been liable for the acts of an agent exceeding his authority, and are liable for the stock issued, the remedy is for damages thus sustained. But the plaintiffs had suffered no damages when the bill was filed. They had then paid nothing to the holders of the certificates; they had sustained no injury. A party who brings a suit must show that when he sues he had a right of action. The bill asks for a *quantum damnificatus*. How could the damages be asserted? For what wrong existing at the time of the suit brought? There is nothing under any of the heads set out in the plaintiff's bill, covering the plaintiff's case, when the bill was filed.

But equity has no jurisdiction over torts: Mitford, 96; Prec. in Chan. 147; 7 Cranch, 89; 13 Price, 749; 14 Vesey, 128; 12 Ib. 395; 1 Cox, 258; 17 Vesey, 277; 1 John. C. C. 150; 3 Meriv. 247; Sugden on Vend. 218; 4 John. C. R. 560; 5 Ib. 193. What is now asked by the bill is out of the province of a Court of Equity: 1 Bibb, 212.

It has been contended that this objection to the jurisdiction is not taken in time. This is not so; in the cases cited, the question of jurisdiction arose on the hearing upon the merits, as here. And in Pennsylvania such is clearly the practice: Rule 31, in case of Equity, Equity Pleader, 547, § 706.

Before a discovery will draw jurisdiction with it, the discovery must not only be demanded, but obtained: 7 Cranch, 89; 1 Story's Equity, 72, 73, 74; 1 Moorehead, 469; Seymour *v.* Seymour, 1 John C. R. 543; 4 Hen. & Munf. 478.

Does the jurisdiction come under the head of account? To enable the Court to entertain it, there must exist privity and mutual accounts; and both must be admitted by the answer. Here there is no privity between the parties as to the subject-matter. In none of the known parties are these relations embraced. There are no mutual accounts; all they ask is an account of stock, no claim for any other account. The account prayed for is merely to ascertain damages: 1 Story's Equity, 458; 2 John C. R. 171. Mere payments on account or credits are not mutual accounts. There must be corres-

R 2

ponding claims on the part of the respective parties: 6 Vesey, 136; 12 Price, 510.

Does agency give jurisdiction? Agency gives jurisdiction when a discovery is required, and when the agency is clear: 2 You. & Jer. 33. The defendants deny distinctly that they have done the acts charged on them, and which are acts not of agency.

The jurisdiction of the Court does not attach under the head of *fraud;* for it can be exercised only when proper relief is asked against the fraud, not when damages are sought as a compensation for the *fraud:* 1 Story, 194.

Nor has the Court jurisdiction derived from the Act of Assembly, independent of its general jurisdiction. The Act applies only to mere matters of form; and never contemplated an abandonment of present rights, or the assumption of one over which the Court is to exercise jurisdiction.

A supplemental or amended bill cannot be filed under a new and distinct right or cause of action, not existing when the original cause was instituted: 1 Paige, 168; 2 Madd. Prac. 519. A supplemental bill is to remedy defects in an original bill, not to supply the absence of a right; Hind's Chan. Rep. 423; Equity Rules, 55.

Further: the Bank of Kentucky could not legally establish any transfer agent in Philadelphia. They did not establish such agency, if they had the right to do so. The Schuylkill Bank had no power to accept such transfer agency, so as to bind the stockholders. The Schuylkill Bank never accepted such agency. A foreign corporation have no authority in another state. A chartered authority cannot exceed that of the state by which it is given: 2 Mass. 88; Sumner C. C. Rep. 47; 13 Peters, 537, 538; 6 Pick. 23–32. The Act creating the Bank of Kentucky gave no authority to create a transfer agent. By the comity between states, foreign corporations are permitted to maintain actions in our Courts. But this gives no greater right than they had under the sovereignty which gave the charter: 22 Wend. 648; 2 Rand. 465, 475. The Bank of Kentucky could not create such agency in Pennsylvania: Story Con. L. Lib. 280–3; 13 Peters, 587. It is in opposition to our state policy: 5 Smith L. 108; 6 Smith, 167.

In point of fact, the Bank of Kentucky never lawfully appointed an agent in Pennsylvania. It could not be created by a by-law of the bank: Sug. on Pow. 264, 265; 26 Wend. 485; Angell & Ames on Corp. 211.

3. The Schuylkill Bank could accept no such agency.    However the Act may affect the Directors personally, their act cannot affect their constituents, the stockholders.    The policy of the law is to confine corporations to the limits laid down in their charter.    Therefore, the Schuylkill Bank could not accept such agency, because it is against public policy.    The bank is forbidden to accept such agency. It has no powers not expressly given it.    It could transfer its own stock under the regulations of the Act of 1814; and what an incorporated bank cannot do, is expressly forbidden.    If it is a banking power, it is expressly forbidden by the Act of 1814; and if it is not a banking power, it is prohibited by its nature and constitution. It has no such implied power.    Such a power to act as transfer agent is not necessary to the bank.    It is not an incident to the object for which it was created.    The power claimed here to be exercised, is not properly incident to the constitution and existence of a bank: 13 Peters, 541; 4 Ib. 152; 2 Cranch, 167; 13 Mass. 193, 197.    The respondents had no powers not expressly given, or necessarily implied: 20 John. 380.    The charter indicates its powers, not the cupidity or necessity of the bank.

4. The Schuylkill Bank never did accept this agency, and never was the transfer agent of the Bank of Kentucky.    This agency could only be accepted by an ordinary corporate act, that of its Board of Directors; some such must be shown, whether on the minutes of the board or not: show it, the plaintiffs must—it is the vital element of their claim.    The absence of minutes, does not make us responsible, without showing the existence of the fact involving liability.    On the minutes exhibited there is no acceptance of this agency.    The Bank of Kentucky knew of the necessity of a full and formal acceptance of such agency by the defendants; and should have required such resolution from the Board of Directors; and had a right to expect one in return for the resolution adopted by their own board.    No corporate act can exist, unless the body has assented in its corporate character: 8 Mass. 298–9.    It must contract by agent, and that agent be clothed with authority to act: Angell & Ames, 165.    If a Cashier acts as a special agent, those who deal with him must look to his authority. As Cashier, he had not the authority here claimed by the plaintiffs: 1 Pick. 209; 14 Mass. 180; 17 Mass. 505; 1 Binn. 27; 1 W. & S. 101; 11 S. & R. 269; 17 Mass. 51; 8 Peters, 12.    His sureties on his official bond could not be held liable for such an act: 2 John. R. 109; Story on Agency, 129; 4 Paige, 133; 12 S. & R. 156.

It has been tacitly admitted that there is no direct evidence of an original acceptance of this agency; but it is alleged there is evidence of a subsequent ratification of the contract.   This may be conceded by us; still the President or Cashier could ratify no illegal act.   Nor could the corporation itself ratify such acceptance of an agency, for the act was illegal.   But did the bank ever ratify it? It must be done by some corporate act.   The corporation contracts, under seal, and this would be evidence of ratification : Angell & Ames, 270; Harris & Gill, 324; 12 East, 22; 12 Wheaton, 89; 10 Mass. 401; 8 Mass. 292; 1 Pick. 297, 304.

If the bank was the agent, it was an agent acting by an agent; this agent being the officer known, selected, and appointed by the principal himself.   If the principal agent necessarily employs a sub-agent, and the necessity for such employment is known to the principal, or necessary from the nature of the agency, the principal agent is responsible only, *bonâ fide*, in the appointment; and not even for that, if the principal names the sub-agent: 1 Strange, 681; 2 Bos. & Pull. 428; 2 Maule & Sel. 301; 8 Cowen, 198; 40 Eng. C. L. R. 170 ; 4 John. R. 382.   The fraudulent entries made by Levis are evidence against him, but no evidence for him: 1 Conn. R. 404; 5 Binn. 195; 2 Baily S. C. R. 362, 380; 2 Washb. C. R. 423.

None of the money received by Levis was ever paid to the Schuylkill Bank.   It has not been traced to us; but must be, to make the respondents liable: 1 Madd. Ch. 355; 9 Wheat. 845; 3 Maule & Sel. 573; Salk. 160; 9 Brown, 361.   It was not the money of the Bank of Kentucky, it belonged to the original holders : 2 Dallas, 67; 2 Campb. N. P. 582.

Mr. *Dallas*, on the same side.—There are facts in this case which look as if the Court were administering the laws of Kentucky, instead of the Commonwealth of Pennsylvania.   It was not necessary to state that the Commonwealth of Kentucky was a direct party to the controversy; that she was here in the view of her legislature, by the action of her great five million state bank; we have the personal presence of the President of this great state institution. We give her a cordial welcome; and no one could be entitled to fairer, or kinder treatment at our hands.   The Court no doubt will receive her with an enlarged hospitality.

But let us maintain our self-respect, and with it, that of the Commonwealth of Kentucky also.   Let her not usurp the dominion of the household that belongs to others.   Consult her wishes, and

her caprices; give her every cordiality.   But do not let her pre-
scribe her own rules for the government of the house.

We are told that the Commonwealth of Kentucky, her state bank
and its President, are in an *affecting position.*   What is the posi-
tion of the disjointed, broken, and scattered fragments of the
Schuylkill Bank? the wretched widow and orphan, whose little
mites were all intrusted in this unfortunate bank?   When we are
told of the misfortunes of this plaintiff, let us remember the humble,
the destitute, and the disconsolate, who are the real parties defend-
ant here, *and not the soulless corporation.*   I will select a single
poor, ragged, homeless orphan, deprived of food, clothing, and edu-
cation, by the mal-administration of this bank, place him here, the
party, and claim for him the same sympathy as is asked for the
Bank of Kentucky, and expect it from the Court.   But the eleva-
tion of one party, or the humility of the other, form no element in
the action of this Court, in deciding positive rights.   But, disregard-
ing both, this Court will look only to the laws of the land, in their
independent exercise of judgment.   All I ask is that both shall be
placed on the same level.   The exalted Commonwealth, and the
humble, broken, bankrupt stockholders of this demolished institu-
tion.

It has been contended that the Schuylkill Bank entered into a
contract with the Bank of Kentucky, by which she agreed to act
as the transfer agent of the stock of that bank.   That as such
agent, issued the fraudulent stock, and, therefore, she is bound to
indemnify the Bank of Kentucky, or pay the money received for
the stock so fraudulently issued.

My first reply to this is, the Bank of Kentucky was not compe-
tent to create and appoint such an agency.   The views I take will
essentially harmonize with the gentleman who has preceded, though
presented in a somewhat different form.   The contract of agency
alleged in the bill, evidence, and argument, is an entire contract
composed of three different parts.   First, a contract for the recep-
tion of the old certificates of the stock of the Bank of Kentucky.
Second, the transfer of the stock evidenced by the old certificate;
and, third, the issuing of new certificates when required so to do.
The first has been fully discussed.   The third feature of this con-
tract is the pungent and all powerful feature in this matter.

It is the power to issue the certificates of stock in the Bank of
Kentucky which renders it different from the first two features in
the contract, which renders it more obnoxious.   It is a power to
increase the capital stock of the bank *ad libitum.*   It is a power to

26

augment the corporate powers of that institution *ad infinitum*, and to control the franchises given by that great state. It puts the franchise into the hands of those holding the certificates issued by the agency. It gives the power to vote at elections to all holding those certificates, and thus to manage the affairs of the institution. Is not then a power to issue certificates the power to make the institution what the parties holding them please? The importance of this power calls for stringent checks on their issuing certificates. Look to our own charters, and this will be observed throughout. It would be unfortunate if the laws were loose and relaxed on a principle so vital in relation to a power delegated to a corporation. In the charter to the Bank of Kentucky, they have watched this thing with scrupulous anxiety. This bank was a great state machine for the regulation and relief of state finances. It was the exclusive agent of the government. It will be observed the first organization was a body of commissioners with power to receive subscriptions of stock, and their powers were different from those of the corporation when organized. After the organization was effected, they are to issue certificates of stock under the *signature* of the President and Cashier at Louisville, and *nowhere else*. No other power is given by the charter. The great and *vital* power, that of issuing certificates, is held at home, at the principal board in the state. It is not a power that can be delegated, nor given to a branch bank in the state. To delegate such a power is to delegate the franchise, capital corporation, and all. It gives to the delegate, authority to make what he pleases; that function of the corporation cannot be delegated, if this can.

We have an express law which absolutely prohibited the Schuylkill Bank from accepting such an agency: Act of 25th March, 1824, 6 Smith, 154.

It is the stockholders of the Schuylkill Bank that claim to be protected. This bank was created for mere banking purposes exclusively, for discount, circulation, deposit, and loan. By the charter, the funds could be appropriated to no other purpose. The affairs of the bank are under the control of the Directors: 12 S. & R. 265. Their authority is derived from the charter. All who dealt with it, knew its powers.

The respondents could not be the agents of transfer. No authority is found in the law for it. It is said to arise from implication; this cannot be: 3 Pick. 232, 40; 17 Mass. 1. If the Schuylkill Bank had power to make this contract, it could only be done expressly. It cannot be implied against her, for it is not

within the legitimate powers of its charter: not necessarily one of the functions of banking; but is foreign to the legitimate purpose of their action.   Such an occupation as this agency, never was contemplated when the charter was granted.

There is still a question of fact for decision: the Schuylkill Bank never made the contract, expressly or impliedly; no testimony shows it.   (Mr. D. here went into a minute examination of the facts.)   He then contended that neither the Directors, its officers, nor the stockholders, in general meeting, could assume such an agency consistent with law: 5 Whart. 354; 16 Mass. 275; 9 Watts, 319; 2 Yeates, 100; 8 Bing. 451; 2 Story, 16, 24; 7 John. 390; 16 Mass. 94; 8 S. & R. 219.   And even if the contract of agency was proved, the bank is not responsible : 2 Black. Rep. 934; 3 East, 490; 7 Term Rep. 681; 4 Bos. & Pull. 34.

Mr. *Sergeant*, in reply.—Up to the 16th December, 1839, no man was even heard to say, in or out of the bank, that it was not the agent of the Bank of Kentucky.   Then it was the Schuylkill Bank conceived the idea of keeping its remnants for itself.   We have the account of the memorable meeting on that day.   They saw that they owed the Bank of Kentucky $1,300,000—Levis was made the scape-goat.   The last communication made to the bank by its Cashier, was when he says he resorted to the sale of this stock to sustain the bank, and that the whole proceeds were paid to its use.   This has never been denied, except argumentatively. It cannot be denied, because it is so.   After saying this, the last thing the Schuylkill Bank could do was to let him run away—and he did, before any one could reach him.   He next emerges forth in Paris, and there under oath says the same thing.

The bank was greatly indebted; every daily statement showed it.   These debts in large sums were paid, $1,000,000 to the Bank of Cincinnati, and $200,000 on another claim; and these funds came from the sale of this stock; so Levis always said and persisted in.   He said it when President, and it occurred when he was Cashier.   The proceeds of the sale of the stock were about the amount of these debts.

The respondents admit we have been injured and wronged in that bank; but they never have shown any disposition to aid us in obtaining satisfaction for our injuries.   This Court is clothed with plenary power to settle the controversy.   It is a Court of special commission, invested with all and every authority, power, and jurisdiction to hear and determine the great questions.   Forms

and technical embarrassments are set aside; the Court has power given it for the settlement of all complaints and controversies between the banks. The Court is to decide all matters in controversy between these parties. The Act does not say matters of equity or of law; it means every claim arising between them under the former bill in equity. The jurisdiction is given over the subject in express terms, and the attempt to turn us round to another tribunal is what the legislature never had in view, in creating the Court the umpire for the settlement of this dispute. This objection to the jurisdiction is a small point, unworthy the dignity of the case, the nature of the questions discussed, and the honour and character of the state.

It is said this is a supplemental bill, and that, as our title to relief arose since the filing of the original bill, we have no standing in Court. There are many answers to this. 1. The defendants have answered the bill, taken proofs, and are now on the hearing. They are now too late, even if the fact is what they assume it to be; and the proceedings under the Act of Assembly are of the limited kind they suppose them. The defendants have put in their answer; we, our replication; the issue has been formed, we are on the hearing: and the objection is to the jurisdiction. But the axiom of equity is that you came in and answered; and thereby admit the jurisdiction. The objection to the jurisdiction is for the benefit of the defendant. He may assert or waive it if he pleases. But he must not lay a trap for his adversary, draw him into expense of a prosecution to the end of the controversy, and then start an objection, which, if made at the outset, would have been met and remedied: Story on Equity, Pl. §§ 612, 472, 627, 481; 1 Paige, 9; 2 Stewart, 420; 4 Dessau. 474; 4 Munro, 581; 2 Bingh. 393; 9 Eng. C. L. R. 444; 5 B. & C. 185; 2 Madd. Ch. 294; 2 Madd. Rep. 240; Mitford, 155, 6; 2 John C. R. 369; 11 Peters, 357.

2. Suppose they had made the objection in time and demurred, could they have sustained it? If we call this a supplemental bill, it is exactly what it ought to be: 2 Madd. 521; Story's Equity, Pl. § 336, p. 269; 2 Paige, 169. We originally went upon the ground of the abuse of authority given by us. I say the Court could have given us relief on the original bill. The difficulty in getting relief to the extent we were entitled, arose from our inability to bring in all the parties entitled to relief before the Court; and this arose from the abuse of the agency of the Schuylkill Bank; we were unable to ascertain who were or were not the proper parties. This constitutes one of the chief claims to equitable relief. For they

issued indiscriminately good and bad stock, and was so confounded, that it could not be distinguished. That Act of Assembly came in and gave us a new remedy, by driving out the technicalities which stood in our way before. This was not originating a new title, but curing a formal defect in the old one. We were then damaged by the conduct of the Schuylkill Bank, and we are damaged still; the only difference is in the mode of obtaining the relief required for the injury done. Our original bill had the *gravamen* of our claim, viz. the injury done the Bank by abuse of authority. We cannot claim under a new and inconsistent title in a supplemental bill; but any other modification of the original claim is the subject of a supplemental bill.

The new matter here is really that introduced by the original bill, the fundamental laws being the same. Our bill as originally framed was defective in one particular: we had not the proper parties. The rule in equity is that all persons must be made parties who have an interest in the subject. When the bill was filed, we had not become the purchasers of the spurious stock. To bring them in, or us as representing them, was the object of the supplemental bill. To remedy this difficulty, the legislature gave relief. This was given to further the remedy, not to affect the right, and was competent for the legislature to give.

This bill is called a supplemental bill, but is also as good an original bill as ever was filed. It was filed in June, 1842. The parties appeared, have answered it, and treated it as an original bill throughout. The Act of Assembly fully authorized this proceeding. And the case must be decided on our laws. The legislature has the right to adopt such rules of equity in Pennsylvania as they please, when they do not affect rights.

The Schuylkill Bank was the agent of the Bank of Kentucky for the transaction of all business connected with the transfer of the stock. The agency began in 1835, and continued till the 16th of December, 1839. That the Schuylkill Bank for this period of time was the agent *de facto*, is indisputable. And now, in 1845, we are called upon to try the question whether she was the agent at all.

When she accepted the agency, she was subjected in all her acts to the operation of the rules of a Court of Equity. It was bound as agent to skill, fidelity, and every duty attached to an agent. She is to account, to inform the principal, and take care of the property; and, in consequence of default, the agent is liable for every share of stock fraudulently issued. The Directors are a part of the

S

corporation, the Cashier a part, and the President is a part; and each of these parts constitute the body politic, and cannot be separated. They are elected by the stockholders; they are continued by them; when elected by the stockholders, are officers deriving their authority from the law.

In proving the contracts of a corporation, you give in evidence the acts of the organic parts of the corporation: 5 Wheat. 326–337; just as you give in evidence the acts and doings of individuals. Did one act as an officer? is the question when a corporation is to be affected by the acts of its officer: 18 John. 341. Third persons must take the ostensible acts of the agent of the bank as evidence of its contracts. A bank usually furnishes evidence of its contracts by its seal, the original mode of contracting; though, in later times, any evidence of *de facto* authority has been binding on a corporation. So a corporation may contract by a promise, express or implied. So also by assent, acquiescence, ratification; by suffering time to elapse, during which time it ought to have dissented: 1 W. & S. 101; 12 Wheat. 73.

Many of the certificates were issued under the seal of this bank. This corporation answers the present bill by its seal; it appears by its seal; it executes instruments by its seal; and surely such is evidence as to its contracts with individuals. Agency is but a contract, and may be proved as any other contract, and by the same means. This bank has been our agent *de facto* for years, and proving that, we prove all required for the establishment of our case.

All the opposite arguments amount to this; that we have not proved the assent of the Board of Directors to the acceptance of the agency. But this is not correct in fact. We have shown that there has been a vote, if that was necessary. We have shown that the agent acted; and when prior consent was necessary, the Court will presume it after these certificates, and the seal of the corporation attached thereto.

A Court of Equity has jurisdiction. 1st. This was a large trust which the Schuylkill Bank had undertaken to perform: 5 Pick. 275. 2d. There was a *fraud* here, and a fraud chargeable upon the bank. For we cannot distinguish what was done by the lawfully authorized agent of the bank, from the fraud of the bank itself. 3d. A discovery is sought by us. This is an exclusive jurisdiction for a Court of Equity. The answer has not disputed the jurisdiction of the Court; 1 John. C. R. 132, *150; 6* Cond. Chan. R. 399; 1 Paige, 92; 4 Cowen, 445; 2 Paige, 84.

So, to take away the jurisdiction of a Court of Equity, the remedy at law must be complete: 11 Conn. 112; 2 John. 310; 2 Ves. Jr. 316; 10 John. 395; 1 Chitty, 594; 3 John. R. 516. So, to prevent multiplicity of suits: 2 Story R. 648. So, in matters of account, law and equity have concurrent jurisdiction; 1 Ves. 173; 2 Stewart, 420; 1 Term Rep. 487; 4 Dessau. 474; 4 Munro, 581; 2 Lettl. 72; 10 Yerg. 121.

The objection to the jurisdiction comes too late. The rule in chancery as to jurisdiction is, that the objection must be made at once: 2 Paige Ch. R. 509; 2 John. Ch. 338; 4 Cowen, 727. An answer overrules a demurrer: Mitf. 327. Can a corporation be a trustee? This is settled: 2 Howard, 128; Argument of Mr. Binney, Ib. 148.

It is said the Bank of Kentucky had no authority to establish an agency here; and if it had, it did not do so according to law. The answer of the defendants does not put this question in issue: 4 Peters, 480. But to where does this argument lead, if the Bank of Kentucky had no authority to contract for this agency? The defendants have got our money. They accepted the agency, and after having got possession of our property, are they to keep it? Can they dispute our title to the property which they have taken from us? Or, if they were not our agents, can they retain our money?

Their accepting the agency and getting our property, estops them from denying our right to it. We say to them, give us our property, which you have enjoyed during your agency. But this is not a question to be decided here. It is a question arising from a *de facto* bank exceeding its authority under the law of the state creating it. That question belongs to the sovereign creating it. A wrong-doer intervenes the objection. This he cannot do: 4 John. C. R. 370; 1 Watts, 387; 7 S. & R. 113; 7 Metcalf, 276; 1 Barn. & Ald. 1; 19 John 1; 9 Mass. 423, 27; 16 Ib. 94, 102; 13 S. & R. 3; 13 Peters, 519; 2 Howard, 427.

But it has been contended that the Schuylkill Bank was incompetent to accept the agency. We say, before you raise this objection, do us justice. Give us back our money; restore us what you have taken from us; then we will dispute that question with you. For the purpose of argument, the defendants admit the fact of agency and the fraudulent manner of executing it; and the loss we have sustained thereby. We say, then, make restitution. Justice requires, when the defendants discovered they could not be our agents, they give us back our property, no matter when that was,

even after suit brought. We say, Give us back our stock : place us in *statu quo*, then discuss this question. It is contended they had no right to accept the agency. But the answer is, you did accept it. There is not a word in any law forbidding the bank making such a contract. But even if there was, it might lead to taking away the charter by the government, but cannot be used as a means of protecting itself against the execution of its contracts, openly, solemnly, and notoriously made. Who objects to it ? The bank. Is this or any other corporation to deny its own purchases ? The Commonwealth stands by and does not object ; sees the bank in the full exercise of the agency ; and can the corporation be thus relieved from its contract ?

So far from this, the legislature have validated the contract by the Act of 1842. This law admits and asserts the validity of the act of the Schuylkill Bank : See 4 Peters, 502.

The power thus to contract is incidental in all corporations, with this limit : that the contract is necessary for the ends and objects of the corporation.

These agencies are both usual and necessary. It gives the bank credit, and the deposit of money ; and such agencies are within the policy of the state. The legislature is the judge of this policy, and have sanctioned it by their act of 1842. It is said there was no consideration. This makes no difference : 20 John. 379 ; 1 Washb. C. C. R. 153.

It is said the holders of the spurious stock had no claim on the Bank of Kentucky. This is settled by the legislature : 9 Eng. C. L. Rep. 450. And we have acquired the right of the holders, and paid for it. A party may go into equity *quia timet*, and afterwards, when the actual injury has arisen, he may engraft it on the original equity : 2 Story, 35, 36, 144–5 ; 1 Story, 475–6. All the other objections raised by the defendants' counsel were fully answered.

The reporter *regrets*, that the limited space in the volume prevents a more full report of the various reasons adduced to sustain the positions assumed by the learned counsel on both sides.

The cause was heard by Judges KING and PARSONS, in November, 1845 ; and on the 28th of January, 1846, the opinion of the Court was delivered by

KING, President.—On the 17th of December, 1839, the complainants, the Bank of Kentucky, filed their original bill on the equity side of this Court, against the defendants. The bill, among other things, charged, that the complainants theretofore had con-

stituted the Schuylkill Bank their agent for the city of Philadelphia, for the purpose of receiving remittances; paying dividends; keeping books of transfer, and permitting transfers of stock; receiving old and granting new certificates. That they had discovered that certificates of their stock, amounting at par value to upwards of $900,000, had been surreptitiously issued by and under the seal of the Schuylkill Bank, and the signature of its Cashier, and were then outstanding against the complainants. That these certificates were not the representatives of stock or certificates, which had been transferred or surrendered. That for these certificates, the complainants had reason to apprehend they might be made responsible, although they never had received any equivalent for the same, nor had any knowledge of the intention of the Schuylkill Bank to issue them. That the funds derived from this breach of trust had come to the possession of the defendants, with the full knowledge of their Cashier of the sources from whence they were derived. And that it was the intention of the Schuylkill Bank to apply them to the discharge of its obligations to depositors and bill holders. The relief prayed for, was that the defendants might be decreed to deliver to the complainants all moneys so received; to disclose the extent and amount of stock so surreptitiously issued; to account to and satisfy the complainants for all liabilities which they had thus occasioned them, if such was the effect of their proceedings; and that an injunction might issue against the defendants, restraining them from parting with any funds in their possession or control, derived from the said surreptitious issues; and any other funds held by them, until the loss with which the complainants were threatened, might be supplied and guarded against. The Schuylkill Bank not objecting to a special injunction to the extent of enjoining it against parting with or disposing of any moneys in its possession derived from the issue of the spurious stock of the Bank of Kentucky, such an injunction issued accordingly. Things rested in this way until the 13th of June, 1842, when the Legislature of Pennsylvania passed an Act, relating, among other things, to the subject of this controversy. This Act provides "that the complainants should be authorized to proceed in equity in this Court against the defendants, and any other person or persons they may think fit to make a party, defendants, either by a new and original bill, *or by amending* and enlarging any bill then pending in this Court *for the settlement and decision* of all *controversies, complaints, claims,* and *questions* between these banks; and especially all and *every controversy, claim,* and *question,* arising out of cer-

s 2

tain alleged excessive issues of certificates of stock of the said Bank of Kentucky, or liabilities therefor, and commonly known by the name of spurious stock; or out of any disposition or transfer of the same, or any liability arising therefrom; and all and every account or accounts between said banks, of what nature or kind whatsoever, so as to make a final end thereof;—and that in such proceedings it should not be necessary nor required nor allowed to make or bring in any other party or parties but the said banks, except as aforesaid; and that the said Court be authorized to take cognisance and jurisdiction of any suit in equity so as aforesaid instituted, and to proceed to hear and determine the matters aforesaid, between the said banks, and without other parties than as aforesaid, after the manner and course of a Court of Equity:—and to make such final decree thereon, and to grant such relief as to justice and equity pertain." Then follow some direct enactments and provisoes not material to be here introduced. Another section of the Act directs " that, in the proceedings authorized by the first section of this Act, the Bank of Kentucky shall be taken and considered as representing the holders of 'spurious stock,' and suing not only for their own use, but also for the use of said holders." On the 22d of February, 1842, the legislature of Kentucky passed a law granting certain powers to the Bank of Kentucky, which act authorized the bank to increase its capital stock one million of dollars, and gave it ample authority to compromise with the *bonâ fide* holders of spurious stock issued by the Schuylkill Bank, by exchanging share for share such spurious for genuine stock, and by other means provided in the law. In pursuance of this law, the Directors of the Bank of Kentucky have from time to time, since its enactment, compensated nearly all the holders of the spurious stock issued by its Philadelphia agent, so that few of these holders remain unsatisfied.

On the 6th day of September, 1842, the complainants brought what they term "their amended and supplemental bill," against the Schuylkill Bank and Hosea J. Levis. This bill refers generally to the original, and then proceeds at great length and with great precision to charge the injuries complained of, for which redress is sought against the Schuylkill Bank. It sets forth the corporate existence of the complainants; their authority to appoint in Philadelphia a transfer agent of their stock; the appointment of the Schuylkill Bank as such agent; its acceptance of the same; and the terms of such acceptance; the prescribed forms of executing the duties of the appointment, and generally the duties and obli-

gations of the trust. It proceeds to charge the defendants with the false issue of upwards of 13,000 shares of Kentucky Bank stock, and that it was done in so artful a way, that it was not until the change in the Philadelphia agency of the bank, and when, on the 16th of December, 1839, the transfer books were about being removed, that the fraud was discovered. The bill then proceeds to explain the means resorted to by the bank for the discrimination of the good from the spurious stock, and the impossibility, from the complication of good and bad stock, held by the same owners, of arriving at any satisfactory or practical result. It charges that the proceeds of the sale of this spurious stock went immediately and directly into the Schuylkill Bank, and were applied to the payment of its debts and liabilities, and that by this means the existence of that bank was continued. That on the 16th of December, 1839, when the over issue was first ascertained, there was standing to the individual credit of Hosea J. Levis, then President of the Schuylkill Bank, a sum exceeding $300,000: that on that night, having resigned his office, he drew his check for this sum in favour of H. J. Levis, Cashier, and thus his individual account was closed, and H. J. Levis, Cashier, was credited with the amount of the check; and by this means the Schuylkill Bank possessed themselves of this large amount, and have applied it to the use of that bank. That Levis, on the night of the day these transactions took place, repeatedly declared, that the issues of spurious stock were made, and the stock sold to raise money to get the Schuylkill Bank out of difficulties and embarrassments, and that the whole proceeds were applied to that object, and not to his individual use. That the Schuylkill Bank, although having a large amount of real and personal property, refuses to retire the spurious stock, or furnish money to do so; or to give any just account of its agency, or in any respect to do justice to the complainants. That the complainants were subjected to the demands of the holders of this spurious stock; who, in some instances, had proceeded against them in equity, either to be recognised as lawful stockholders of the Bank of Kentucky, or to coerce payment from that bank of the amount of money paid by them for the said stock.

The bill then further states, that the embarrassments of their condition led to the passage of the Acts of the Kentucky Legislature of February 22d, 1842, whereby they were empowered to make adjustments with the *bonâ fide* holders of the spurious stock. That, under a certain plan adopted in pursuance of these Acts, they had purchased or recognised certain of these over issues, and were

ready and willing to do the like in regard to all such in the hands of innocent purchasers. The title by which the complainants represent the holders of the spurious stock, derived from the Act of the legislature of Pennsylvania, is then set forth. Other matters are detailed in exemplification of the equity of their case, not necessary to be noticed in this synopsis of the bill. After stating the pretences of the defence, and proposing the necessary interrogatories to the defendants, the relief sought is set forth, which embraces every view of the case the facts stated in the bill would justify, according to the principles and practice of a Court of Equity.

The defendants' answer, which is a voluminous but well drawn paper, denies all the material allegations of the bill. It is only necessary for the Court here to refer to the defensive positions assumed by it, in connexion with those taken in the argument. These are,

1st. That the Bank of Kentucky transcended its charter powers in creating the agency charged in the bill.

2d. That, supposing the creation of such an agency to be consistent with the charter, the power was not executed on this occasion in the manner prescribed by it.

3d. That the establishment and maintenance of such an agency in Pennsylvania, is in violation of her positive laws and inconsistent with her general policy.

4th. That the Schuylkill Bank being a corporation created by the laws of Pennsylvania solely for banking purposes, its Directors could not lawfully enter into such a contract as that set forth in the complainants' bill; nor bind their constituents, the corporation of the Schuylkill Bank, by any such contract made by them on its behalf.

5th. That, even admitting the contract to have been lawfully entered into by both these corporations, still the Schuylkill Bank, in its execution, is responsible only for good faith in the selection of the immediate agent, to whom such execution was necessarily assigned. And this, as well from the operation of the general principle that so far and no further extends the liability of a principal agent, necessarily employing a sub-agent, as because Hosea J. Levis, the Cashier of the Schuylkill Bank, by whom alone all the frauds charged were actually perpetrated, was such sub-agent specially selected by the Bank of Kentucky.

6th. That the Cashier of the Schuylkill Bank had no *ex-officio* power to enter into the contract charged.

7th. That this agency, even if undertaken by the defendants, was a gratuitous agency, which subjected them only to the consequences of gross neglect in its execution, which could not be fairly charged against them.

8th. That at the time of the filing of this bill, the complainants had no claim in their own right against the Schuylkill Bank, the bill being filed prematurely.

9th. That the Bank of Kentucky was under no legal liability, in any way, to compensate the holders of the spurious stock issued by its Philadelphia agent, and that any such compensation made to such holders by it, was a purely voluntary act, giving it no claim for indemnity against such agent.

10th. That the complainants do not legally represent those of the holders of the spurious stock, to whom they have as yet made no compensation.

11th. That in point of fact, the Schuylkill Bank never was the transfer agent of the Bank of Kentucky; but that Hosea J. Levis, in his individual capacity, was such agent exclusively; and with *Levis*, in this relation, the Schuylkill Bank had no connexion.

12th. That the Bank of Kentucky was guilty of gross negligence in not more promptly acting in the close of its Philadelphia transfer agency, when the bank was admonished from various credible quarters, that its agent was abusing the trust.

13th. That Hosea J. Levis was, on the 16th of December, 1839, largely indebted to the Schuylkill Bank, and that the check for $345,511 drawn by him on that day in favour of the bank, was but a partial payment of the amount due by him to the bank, to which he is still a debtor more than $100,000. And that although the sum of $839,608.40, was, as far as the bank can ascertain, deposited by said Levis from the proceeds of the sale of the stock of the Bank of Kentucky, no part thereof was applied to the use or advantage of the Schuylkill Bank, but was deposited to the private use of H. J. Levis, or used by him for his private purposes.

The complainants' case has been discussed under two great heads. 1st, That the Schuylkill Bank was in law and fact the transfer agent of the Bank of Kentucky, responsible for the defaults charged in the bill. 2d, That, admitting this allegation not to be sustained in law or in fact, the Schuylkill Bank is, under the circumstances disclosed in the proofs, liable and subject to pay over to the complainants, $839,608.40, the proceeds of the sale of the spurious stock of the Bank of Kentucky deposited by Levis in the Schuylkill Bank.

Beside the various objections interposed against the complainants' right to recover on the law and merits of their case, technical objections have been raised, as well to the form in which their case is submitted to the Court, as to our jurisdiction over it, as the proper subject-matter of equity cognizance.

Before proceeding to the main questions, it is necessary that these preliminary objections should be disposed of.

1st. The defendants, treating the complainants' amended and supplemental bill as a supplemental bill, technically so called, and, independent of the Act of the 13th of June, 1842, contend, that, according to the settled principles and practice of a Court of Equity, it is irregular. For the clearer understanding of this exception, it is necessary to inquire somewhat into the nature, extent, and operation of supplemental bills, as understood in equity practice. When new events, or new matters have occurred since the filing of an original bill, a supplemental bill is the proper mode of bringing them before the Court; for, generally, such facts cannot be introduced by way of amendment: Story's Eq. Pleadings, § 336; Stafford *v.* Howlett, 1 Paige, 200; Barfeld *v.* Kelly, 4 Russell, 355. That such new matter, if introduced by way of amendment, instead of by way of supplemental bill, is demurrable, is shown by the case of Pilkington *v.* Wignal, 2 Maddock's Rep. 466 (Am. ed.). This doctrine has been carried to the extent that it has been holden, that a new original bill, filed pending a former bill for the same subject-matter, but differing from the latter in setting out a new title acquired since the commencement of the first suit, could not be sustained by a Court of Equity. Such a proceeding is deemed vexatious, inasmuch as any new event happening since the filing of an original bill, which gives a new interest or a new right to a party complainant, should be introduced by way of supplemental bill: Sanders *v.* Frost, 5 Pickering, 275.

But to enable a complainant in equity to file a supplemental bill, introducing matters which have arisen since the filing of the original bill, the original bill must be one on which some valid decree could be made by the Court. If wholly defective, it cannot be made the basis of a supplemental bill; for if the complainant had no ground for proceeding originally, he should file a new bill, showing a cause entitling him to relief. But if his original bill was sufficient to entitle him to one kind of relief, and facts subsequently occur which entitle him to other or *more extensive relief,* he may have such relief by setting out such new matter in the form of a supplemental bill: Candler *v.* Petit, 1 Paige, 168. In this case the original bill

was held to be sustainable only so far as it showed cause for the issuing a *ne exeat* prayed for by it among other things; and on this substratum the complainant founded a case for full relief, arising from a subsequently acquired title.

The new title acquired by these complainants subsequent to the filing of the original bill, consists in the authority given them by the act of 1842 to represent the holders of the spurious stock; and the beneficial cause of action acquired by them, in consequence of having indemnified the wronged holders of this stock, by giving them other and genuine stock for that imposed on them by the complainants' fraudulent agent. Such I regard to be the true nature of the compromise between the holders of the spurious stock and the Bank of Kentucky, by which nearly all the former received genuine in lieu of spurious stock, on transferring to the bank all their interest in the latter.

Could this new title be introduced, in consonance with the principles expressed, into a bill supplementary to that originally filed? This depends on the solution of the single and simple proposition, whether the complainants' original bill of December 17, 1839, exhibited a claim to *any* equitable relief. If it did, then this so-called supplemental bill is, on the strictest principles, properly filed.

Does the bill of 1839 suggest *any* grievance entitling the complainants to equitable relief? In the abstract of this bill, previously given, it is seen, that the facts of the Schuylkill Bank being the agent of the Kentucky Bank; that as such it had surreptitiously over-issued certificates for upwards of $900,000 of Kentucky Bank stock; and that the funds derived from such issues were in the possession of the Schuylkill Bank; are distinctly averred. In the relief sought by that bill, it is asked that the Schuylkill Bank should disclose to whom, and to what extent and amount, such surreptitious certificates had been issued; and that the defendants might *account to* and *satisfy the* Bank of Kentucky *for all liabilities* which these issues may have occasioned it.

This is substantially a prayer for a discovery of the manner in which the agency had been executed, and for indemnity against the consequences which might follow from, any illegal and fraudulent doings of the agent in the course and conduct of the agency, for which the principle *might*, according to law, be responsible; and sufficiently definite, when we are considering whether on the face of the bill, the complainant exhibits any case for equitable relief. Is such relief grantable in equity to a principal, threatened with

the consequences of the wrongful acts of his agent, in a case circumstanced like that disclosed in this bill?

That the Kentucky Bank was answerable, in some form, for the frauds of their authorized agent, we cannot entertain a doubt. The general rule on this subject is, that every principal is held liable to third persons, in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, or other malfeasances and omissions of duty, of his agent, in the course of his employment; although the principal did not authorize, or justify, or participate in, or indeed know of such misconduct, or even if he forbade or disapproved of them: Story on Agency, § 452. In any such case, the principal holds out his agent as competent and fit to be trusted; and thereby in effect warrants his fidelity and good conduct in all matters of the agency. On the other hand, the agent is responsible to his principal for all loss or damage accruing to the principal from his omissions, commissions, frauds or torts; and bound to make him a full indemnity. And this, whether the loss or damage be direct to the property of the principal, or whether it arises from the compensation or reparation which he has been obliged to make to third persons, in discharge of his liability to them for the acts or omissions of his agent: Ibid. § 217. These principles, as such, I do not understand to be disputed. But the argument is against their application; the defendants contending that, until actual satisfaction to third persons, aggrieved by the doings of his agent, the principal has no claim for reclamation on him. This position, however, is not true to its full extent, even at law. For at law, where the breach of duty in an agent is clear, it will, in the absence of all evidence of other damage, be presumed that the party has sustained nominal damage: Mazette v. Williams, 1 B. & Ad. 415. But in equity, in a case of this kind, a more substantial remedy will be given to a principal over whom impends certain responsibility for the frauds of his agent. The true doctrine on this subject, I conceive, may be found in the case of Renelaugh v. Hayes, 1 Vern. 189. There the Earl of Renelaugh assigned certain shares of the excise in Ireland to Sir James Hayes, on his covenanting to save the Earl harmless, and to stand in his place, touching the payments to the King that were to be performed by the Earl. The Earl, in his bill, suggested that he was sued by the King for £20,000, which Sir James ought to have paid; and prayed that he should be decreed to perform his agreement. To this bill, it was argued as here, that "there was no proper subject for equity, nor anything that the Court could decree; for here was

no specific covenant, but only a general and personal covenant for indemnity, and that was not decreeable in equity; for it sounds only in damages which cannot be ascertained in this Court; *especially as the case was;* there being no breach of the covenant assigned in the bill: for a suit brought by the King is not in itself any breach, for the defendant could not prevent that. He would defend the suit, and if nothing was recovered, there was no breach."

But the Lord Keeper North decreed that Sir James should perform his covenants, and directed the case to a master; and that, *toties quoties,* as any breach should happen, he should report the same specially to the Court; and the Court then might, if there be occasion, direct a trial at law on an issue of *quantum damnificatus.* And he conceived it reasonable that Sir James should be decreed to clear the Earl from these suits and encumbrances within some reasonable time.   Raithby, in his note 4 to this case, says that one year is the time specified in the decree.   The Lord Keeper compared the case to that of a counter bond, " where, although the surety is not troubled or molested for the debt, yet at any time after the money becomes payable on the original bond, the Court would decree the principal to discharge the debt; it being unreasonable that a man should always have such a cloud hanging over him."   In his note 3 to this case, Mr. Raithby quotes the following as one reason assigned by Sir Francis North for his decree, as it appears on the Register's Book : " That the computation of damages in such a case must depend upon the examination of *long and intricate accounts* of the revenue in Ireland, *which cannot be made upon a trial at law,* and *a jury cannot* foretell what damages *will after happen,* but must give their verdict upon uncertainties, which will afterwards occasion suits in this Court."   The extent of the fraudulent over issues of the stock of the Bank of Kentucky, the numbers of the parties aggrieved, and the complication of relations such a state of things must necessarily give rise to, render the remarks of Lord Keeper North most apposite as to the fitness of this case for equitable cognizance.   We admit that Renelaugh *v.* Hayes is distinguishable from the complainants' case in this, that in the former there existed an express covenant of indemnity.   But in cases like the present, the acceptance of the office of agent implies an obligation to keep the principal indemnified from all unauthorized acts committed under colour of the agency.   It was upon the reasonableness that Sir Thomas Hayes " should keep the Earl clear of suits and encumbrances," that the Lord Keeper based his decree.   The analogy which he invokes, of the case of a surety claiming indemnity

28                                  T

from his principal after the obligation is ripe, but before it is enforced, manifests the ruling principle of the decree. "Courts of Equity," says Judge Story (Equity Jurisprud. § 730), "will interpose in many cases to decree specific performance of express, and *even of an implied contract*, where no actual injury has as yet been sustained; but it is only apprehended from the peculiar relation between the parties." See Flight *v.* Cook, 2 Vesey, 619. "Any covenant, though not specific, but only a general covenant to indemnify," says Fonblanque, "may be decreed here, for equity prevents mischief, and it is unreasonable that a man should have a demand continually hanging over him." Book 1, ch. 1, § 8; see Baker *v.* Shelburg, 1 Cas. in Chan. 69. Having regard, therefore, to the implied contract, which binds every agent to keep his principal indemnified; to the right which every party entitled to be indemnified has for relief against the anticipated consequences of such liability after it has occurred, but before it has been consummated against him, by a recovery at law or equity; and to the extent and complexity of the claim for such indemnity in this case; we are of opinion that the original bill did disclose a case for the interference of a Court of Equity, so far at least as it demanded indemnity against the consequences of the aggressions charged to have been perpetrated by the defendants, and a discovery and account of the amount and extent of those malversations. If, then, the original bill exhibited any case for equitable relief on its face, the technical regularity of introducing any title subsequently acquired by the complainant is made out.

Besides, we incline to the opinion, that the objection taken to the supplemental bill, as having no sufficient basis in the case disclosed in the original, is out of time. It ought to have been interposed by way of demurrer, or the defendant should have insisted on and claimed the benefit of this exception in his answer. Pilkinton *v.* Wignall, 2 Madd. Rep. 466 (Am. ed.); Stafford *v.* Howlet, 1 Paige Rep. 101-2; 23d Rule in Equity, 1822. The complainant would then have received the cautionary admonition against the further prosecution of a defective proceeding: which candour in pleading demands. A party should not be permitted to lie by with such an objection, and to spring it upon his adversary, when the latter has, on the answer meeting the case on the merits, with time, labour and expense, prepared his case for a final hearing.

The *second preliminary objection* taken is, that the Court ought not to take cognisance of the complainant's case, because even as exhibited in the amended and supplemental bill, it discloses one in

which the complainants' remedy is at law and not in equity. That the bill seeks nothing but compensation or damages for a tort, said to have been committed by the defendants, in the fraudulent over issue of the stock, and that for such a wrong the complainants' remedy, either in their own right, or as representing others, is at law exclusively. Certainly, the great object of this proceeding on the part of the complainants, is to obtain compensation and satisfaction for the damages resulting to them from the violation of duty charged on the defendants, whom they represent to be their defaulting agents.

The general rule is, that for breaches of contract, and other wrongs and injuries cognisable at law, equity does not entertain jurisdiction to give redress by way of compensation or damages, where these constitute the sole object of the bill ; there being in such cases a plain, complete and adequate remedy at law. Where, however, compensation or damages are incidental to relief, the jurisdiction properly attaches in equity as inseparable from proper relief. It is where no other claim for relief is presented, and where the remedy at law is plain, direct and unembarrassed by any complexity in the subject matter of the claim for compensation or damages, that the jurisdiction in equity becomes questionable. It was because of its infraction of the true line between law and equity in this class of controversies, that the decision of Lord Kenyon, in Denton *v.* Steward, 1 Cox Eq. Rep. 258, was questioned by Sir William Grant, but deferred to in Greenway *v.* Adams, 12 Ves. 201; and again by the same great magistrate in Blore *v.* Sutton, 3 Meriv. 247 ; and which led to its almost repudiation by Lord Eldon, in Todd *v.* Gee, 17 Ves. 277. In Phillips *v.* Thompson, 1 John. C. Rep. 150, Chancellor Kent seems to have been disposed to go the extent of Denton *v.* Stewart ; but in his subsequent adjudications in Hatch *v.* Cobb, 4 John. C. R. 560, and Kempshall *v.* Stone, 5 John. C. R. 195, he comes to the result, that although equity, in very special cases, may possibly sustain a bill for damages on a breach of contract, it is clearly not the ordinary jurisdiction of the Court ; and it is upon its specialties that he sustains his previous decision in Phillips *v.* Thompson. This appears to be the doctrine of Chief Baron Alexander in Newham *v.* May, 13 Price Ex. R. 749. And yet in the City of London *v.* Wash, 3 Atk. 512, 517, Cudd *v.* Rutter, 1 P. 570, Pratt *v.* Law, 9 Cranch, 492–4, Woodcock *v.* Bennett, 1 Cowen R. 711, the jurisdiction to award damages for the breach of a contract, although specific performance was refused, is asserted. "In the present state of the authorities,"

says Judge Story, "involving, as they certainly do, some conflict of opinion, it is not possible to affirm more than that the jurisdiction for compensation or damages does not *ordinarily attach* in equity, except as *ancillary* to a specific performance or *some other relief.* If it does attach in any other cases, it must be under very special circumstances, and upon peculiar equities; as for instance, in cases of *fraud,* or where the party has disabled himself by matters *ex post facto* from a specific performance; or *in cases where* there is no *adequate remedy at law.*"

Here is furnished us clear rules by which we can readily test the question whether in a given case equity will or will not entertain jurisdiction for the enforcement of compensation or damages. Is an award of compensation or damages, a necessary incident to other relief, to which the party claiming it is entitled, and without which such relief would not be effective ? Are there any special circumstances or equities in the particular case, which according to the course of equity administration, will induce the Court to entertain the bill, although its fruits can only be realized by compensation or damages ? In either and in both these aspects is this bill sustainable. That it presents a case for relief, was shown in the previous remarks on the question of the regularity of the supplemental bill, by which it appeared that the Kentucky Bank could rightfully come into equity against her fraudulent agent after the issue of the spurious stock, and before actual satisfaction made to the parties immediately aggrieved : and that the Court would retain such a bill, and from time to time, either by reference to a master, or by an issue of *quantum damnificatus,* ascertain the amount of the complainants' claim to indemnify as liabilities ensued : Vide Renelaugh *v.* Hayes, supra.

The want of an adequate remedy at law in this case furnishes another element of jurisdiction in the Court, and a consequent claim to relief in the complainants. It is admitted that the just foundation of equitable jurisdiction fails where there is a plain, complete remedy at law. It is, not, however, enough, that there is a remedy at law ; it must be plain and adequate, or in other words, as practical and efficient to the ends of justice, and its prompt administration as the remedy in equity : Boyce *v.* Grundy, 3 Peters, 215 ; New London Bank *v.* Lee, 11 Conn. Rep. 112. Where the remedy at law would necessarily lead to the multiplication of suits, and the increase of useless and burdensome litigation, equity maintains its jurisdiction. Although, in ordinary cases, an action for damages, brought by a principal against his agent, to

recover an indemnity against such agent for losses the principal has sustained through his malversations, might suffice; yet in a case like that before us, where the alleged infractions of duty are so multifarious, involving such an amount of property and such a numerous body of individuals aggrieved; and where the machinery employed by the faithless agent has so complicated and tangled his whole transactions, as to make it almost impossible to locate the spurious stock issued, or to distinguish it with certainty from the genuine; equity would entertain jurisdiction, because the remedy in such a case at law would neither be plain, adequate, practical, nor efficient to the ends of justice and its prompt administration; and because by so doing a needless and oppressive multiplication of suits would be avoided. The case of the American Insurance Co. *v.* Fisk, 1 Paige, 90, is a good exemplification of this principle, coming from a judge who stands at the head of American equity lawyers. That was a bill brought to test the regularity of the doings of a Wrecker's Court at Key West, under whose order 538 bales of cotton had been sold for salvage. Fisk, the defendant, was a *bonâ fide* purchaser of 140 bales. In answer to an objection taken by the defendant's counsel that an action of trover at law was the plaintiffs' remedy, Chancellor Walworth remarks : " The accidental obliteration of the marks upon the cotton, which rendered it impossible to ascertain to which of the various owners of the cargo the part saved belonged, together with the *complicated rights of the different parties in interest*, made the plaintiffs' remedy at law at least doubtful and certainly difficult. These alone would be sufficient grounds to sustain the jurisdiction of the Court." And to the same effect are Wamburzee *v.* Kennedy, 4 Dessaussure, 481, and Weymouth *v.* Boyer, 1 Vesey, Jr. 416.

Again, the peculiar character of the parties, as well as the peculiar nature of the claim, also make this controversy the proper subject of equitable cognisance. The complainants are principals demanding an account and discovery of his doings from their agent. " Whenever such a relation exists," says Sir Thomas Plumer in M'Kenzie *v.* Johnson, 4 Madd. 198, " a bill will lie for an account." In Massey *v.* Banner, Ibid. 416, the same judge says, that "in all cases a principal may file a bill against an agent for an account." The case of King *v.* Russell, 2 You. & Jer. 33, relied on by the defendant, does not impeach the general doctrine on this subject. The Chief Baron, in that case, says in terms : " Undoubtedly a principal is entitled to an account from his agent, and may apply to a Court of Equity for that purpose." It is true he qualifies the gene-

T 2

rality of claim to equity interference in cases between principal and agent, by saying, that a ground for such interference must be laid by showing an account which cannot be fairly investigated by a Court of law. The transactions of this agency are such as, in my opinion, bring this case clearly within Baron Alexander's limit.

Hovenden, in his Treatise on Frauds, § 162, gives equity the jurisdiction, upon the ground that *such transactions are coupled with a trust*.

The *fraud* charged in the bill would give the Court jurisdiction, representing, as the complainants do, the parties originally cheated in the purchase of the spurious stock: Burrowes v. Lock, 10 Ves. 470. Similar frauds have been frequently relieved against in equity, by compelling the return of the consideration paid, to the party defrauded. In Green v. Bennet, 1 Simons, 45, it was held that a bill in equity lies to recover deposits paid by a shareholder in a joint stock company where the project is a bubble. See Blaine v. Agare, 1 Simons, 37. These cases were ruled on the authority of Colt v. Wollaston, 2 P. W. 154, where a similar recovery was had. " If," said the Master of the Rolls in this case, " this were a fraud against any private or single person, a Court of Equity would relieve ; a fortiori, where it is fraud against great numbers ; against multitudes, where the mischief is more extensive and many families ruined."

The jurisdiction of the Court, therefore, seems to rest on the most solid grounds, and the power to ascertain the amount of compensation or damages exists, as well from being a necessary incident to the granting of proper relief, as from the special circumstances and peculiar equities of the case disclosed in the complainants' bill.

But, in addition to this, an objection to the Court's proceeding, because the complainant has an adequate remedy at law, cannot regularly be taken after the defendant has answered on the merits. After a defendant has put in an answer in chancery, submitting himself to the jurisdiction of the Court without objection, it is too late to insist that the complainant has a perfect remedy at law, unless the Court is wholly incompetent to grant the relief sought by the bill: Grandin v. Le Roy, 2 Paige, 509 ; Ludlow v. Simonds, 2 Caine's Cases, 40 ; 23 Pick. 153. That Rule 23d of the Equity Rules of the Supreme Court, U. S., which were in force in this Court when this answer was filed, does not cover this case, inasmuch as it only embraces matters applicable to the merits, and not mere pleas to the jurisdiction, is shown by Livingston v. Story, 11 Peters'

Rep. 393. Besides, the defendants have not claimed in their answer the benefit of this declinatory exception, without which the 23d Rule could not avail them. The objection in equity, to jurisdiction on the ground that courts of law possess adequate remedies to meet the plaintiffs' case, is manifestly a very different thing from statutory disabilities in the way of proceeding in a given case; which, our decisions at law say, may be interposed at any time. The latter exhibit a positive want of legal authority; the former particularly in those cases in which the Court is competent to give the relief sought, is a claim to be heard elsewhere, which the defendant may assert or waive at his pleasure. And he is considered as waiving it, when he does not assert it at the earliest period he is called upon to respond to the complainant's bill.

So far, we have treated the complainants' case, both as respects the regularity of the form of procedure, and the adequacy of our jurisdiction in equity to award appropriate relief, independent of the provisions of the Act of the 13th of June, 1842; and, as we conceive, have shown that, without that Act, the complainants had a standing in this Court, and could have obtained, through its general powers, aid sufficiently extensive to satisfy all existing reclamations against the defendants, and others that might thereafter arise. The severity with which this law was commented upon, has induced the inquiry whether it was not rather declaratory of old, than introductory of new rules in equity principles and practice. And we regard it substantially to be the former. But, however it may be viewed, it is but a law operating on the remedy for a breach of contract, and in no respect affecting the contract itself: Satterlee *v.* Mattheson, 2 Pet. 412. Legislatures may, from time to time, provide new remedies, modify old ones, validate defects in form, provide new tribunals, or new process for vindicating existing rights; and such enactments are perfectly within the limits of the state and national constitutions. The forms of administering justice, and the duties and powers of Courts as incident to the exercise of a branch of sovereign power, must ever be subject to legislative will. The authority in the state legislature to make a civil cause of action, heretofore from necessity the subject of common-law jurisdiction, a matter of equitable cognisance, is shown by the judgment in Livingston *v.* Moore, 7 Peters, 546. Speaking of equity jurisdiction, the Court in this case says, that, " as an essential branch or exercise of judicial power, it is acknowledged to exist everywhere: nor is it possible for any one acquainted with its nature and character, and the remedies it affords for the assertion

of rights or the punishment of wrongs, to doubt that the power to exercise it, and the means of exercising it, must exist somewhere; or the administration of justice will be embarrassed, if not incomplete. To administer it through the ordinary powers of a common-law Court is impracticable; and hence, whenever there exists no provision in the jurisprudence of a country for its full exercise, the consequence must ever be, that, after the common-law Courts have engrafted into their practice as much as can be assumed, the legislature is compelled to exercise the rest; or else leave a large space for the appropriate field of judicial action unoccupied." The Constitution of the state in terms authorizes the legislature to "vest in the existing Courts such powers to grant relief in equity as *shall be necessary,*" and from time to time to enlarge or diminish those powers, or vest them in such other Courts as they may judge proper for the due administration of justice. The legislature are the judges of this necessity, and can exercise the power granted to any extent, not inconsistent with, the reserved rights of the people.

On the constitutional propriety of the Act of 1842, it seems unnecessary further to dwell. Its provisions, which have been already referred to, are full, general, and complete; and seem intended, and no doubt were so, to embrace every technical difficulty in the way of the case, either as respects the form of procedure, the jurisdiction of the Court, or the necessary parties to the bill. The complainants are authorized, either to amend and enlarge their pending bill, so as to embrace their entire case, or to file a new and original bill for this purpose; and this Court is authorized to take cognisance and jurisdiction of *any suit* or *suits in equity* instituted, or to be instituted, between these banks, and to hear and determine all controversies between them, arising out of the excessive issues of the stock of the Bank of Kentucky, "after the manner and course of a Court of Equity." It is from the last expression the argument is drawn, that the Act did not intend either to give any special jurisdiction to the Court in this case, or to permit any modifications in the proceedings not authorized by the settled practice of Courts of Equity. Such, however, is not our opinion. On the contrary, we think the Act intended making this whole controversy between these two banks, growing out of the issue of the spurious stock of the Kentucky Bank, a subject of special jurisdiction in this Court; that, to bring the matter before us, it authorized the complainants so to amend and enlarge the original bill as to embrace the entire case of all the parties grieved by the alleged over issue of stock; and that, when the cause of controversy was

so introduced to the Court, it was to be prosecuted and determined, and the determination carried into effect, "after the manner and course of a Court of Equity." The Act clears away all obstructions that impede the approach to the merits of the case; and these were left to be adjudicated upon according to equitable principles by this tribunal, specially designated for the purpose. To this extent does the Act go, and no further. It establishes no right in the Kentucky Bank except the right to be heard in a Court of Equity; it imposes no liability on the Schuylkill Bank except that of responding to the claim of the Kentucky Bank, before a lawfully constituted tribunal, clothed with the authority to determine between them as to equity and justice pertain. In my opinion, therefore, the cause is properly brought before us, and we have perfect jurisdiction to give the equitable relief prayed for by the plaintiffs, as well from the powers we inherently possess as 'a Court of Equity, as from the force and effect of the Act of 1842.

These obstructions being removed, we proceed to the consideration of the objections in chief. If, in point of fact, the Schuylkill Bank was the transfer agent of the Bank of Kentucky, this relation originated in a mutual contract between these corporations, the existence or non-existence of which has been the great subject of their litigation. The legal capacity of the Bank of Kentucky to make a valid contract in Pennsylvania, is not an open question since the decision of the Supreme Court of the United States in the Bank of Augusta *v.* Earl, 13 Peters, 519. By the comity of nations, foreign corporations are permitted to make contracts within their jurisdictions, when they are not contrary to the known policy of the state, or injurious to its interests. This is nothing more than the admission of the existence of an artificial person, created by the laws of another state, and clothed with the power of making certain contracts. It is but the usual comity of recognising the laws of another state. Natural persons, through the intervention of their agents, are continually making contracts in countries in which they do not reside, and where they are not personally present when the contract is made; and nobody has ever doubted the validity of these agreements. And what greater objection can there be to the capacity of an artificial person by its agents to make a contract *within the scope of its limited powers*, in a sovereignty in which it does not reside, provided such contracts are permissible by the laws of the place? Augusta Bank *v.* Earl, 13 Peters, 588–9. If, however, the law creating such a corporation does not, by the true construction of the words used in the charter, give it the right

29

to exercise its powers beyond the limits of the state, all contracts made by it in other states would be void : Ib. 577–8. For a corporation can make no contracts and do no acts within or without the state which creates it, except such as are authorized by its charter; and those acts must be done by such officers and agents, and in such manner as the charter authorizes: Ib. 577. From these doctrines of the supreme national tribunal, to which we unhesitatingly defer, it would seem to follow, that the question whether a corporation, created by the laws of one state, has transcended its charter powers, may be inquired into by the tribunals of another state, in which such corporation is a suitor, seeking to enforce a contract made in and with the citizens of such state. Otherwise a corporation created by one state could make any and every contract in another, under pretext of its charter, no matter how inconsistent with the ends of its constitution. Such a doctrine would soon terminate in the legislative exclusion of the corporations created by the laws of one state from all others. By voluntarily coming into the Courts of a state, different from that of its creation, seeking the enforcement of a contract entered into by it with the citizens of the former, a corporation binds itself to establish that the law of its creation gives it authority to make the contract it seeks to enforce. While its existence as an artificial person in the state of its creation is acknowledged and recognised by the laws of the state where it assumes to contract, yet is it permitted by the laws of the latter to exercise there only the powers with which it is endowed. Where the tribunals of the creating state have adjudicated on the extent of the franchises possessed by such corporation, a proper spirit of comity requires that such adjudication should conclude the question of the amount of its charter privileges in the foreign forum in which it is a suitor; and where such a corporation has power to contract, if it should pass the exact line of its power, it would rather belong to the government by which it was created to exact a forfeiture of its charter, than for a foreign Court in a collateral way to decide a question of misuser, by setting aside a just and *bonâ fide* contract : Silver Lake Bank *v.* North, 4 John. C. R. 373.

Adopting these principles as our guide in the investigation, we will proceed to inquire :—*First,* Whether, " by the true construction of the words used in its charter," the Bank of Kentucky had the the right to establish an agency in Pennsylvania for the transfer of its stock, authorizing such agent to receive from its stockholders transferring their stock, the surrender of their old, and empowering

such agent to issue new certificates to the transferees ? *Second*, Whether any contract on behalf of the Bank of Kentucky for this purpose was made " by such officers and agents, and in such manner as the charter authorizes ?"   *Third*, Whether the establishment of such an agency in Pennsylvania is in violation of her positive laws, or inconsistent with her general policy ?

The authority to establish such agencies, if it exists at all, is found in the 26th sect. of the Act of the Kentucky legislature, " to establish the Bank of Kentucky."   This section is in the following words :—" That the President and Directors shall issue certificates of stock to the holders thereof whenever they shall be paid for ; and the shares of the capital stock of said bank shall be considered and held as personal property, and assignable and transferable only *in such manner and at such place or places* as the President and Directors of the principal bank shall by their by-laws prescribe." That these words are broad enough to authorize transfer agencies to be established, not merely in the Commonwealth of Kentucky, but in any other place where such agencies should be permitted, we can entertain no doubt.   They are found in a law creating a bank of five million dollars capital, in which subscription books are authorized to be opened " in any of the principal cities of the United States."   Such a power in the corporation was essential to its effective organization, and was clearly intended to be embraced in the broad language of this enactment.   In The Augusta Bank *v.* Earl, the Georgia charter in general terms authorized the bank to deal in bills of exchange.   " It consequently," says Chief Justice Taney, " gives it the power to purchase foreign bills as well as inland ; in other words, to purchase bills payable in another state. The power thus given clothed the corporation with the right to make *contracts out of the state*, as far as Georgia could confer it."   Again, " the general power to purchase bills without any restriction as to place, by its fair and natural import, authorized the bank to make such purchases whenever it was found convenient and profitable to the institution ; *and also to employ suitable agents for that purpose.*" Further reasoning, as to the power of the Kentucky Bank to establish such an agency here, appears to be superfluous.

But was this admitted authority of the Bank of Kentucky exercised " by such officers and agents, and in such manner, as the charter authorizes ?"   This is denied by the defendants, who insist that such an agency could only be created by by-law, and not by a resolution of the bank ; and that in no way could power be given to it to accept the surrender of the old, and to issue new certificates

of ownership of stock. Conceding for the present that such an objection to the regularity of his appointment can be interposed by an alleged fraudulent and defaulting agent called to account in a Court of Equity, let us examine whether there is anything in it. The charter, we have seen, gives the President and Directors of the principal bank, plenary power to provide by by-law, how and where the stock of the bank should be transferable. It contains a grant of power, without limit or stint, over the whole subject, to be exercised as the by-laws should prescribe. In the execution of this power, the President and Directors passed *this* by-law : " Art. 12.— The stock of this bank shall be assignable and transferable at the bank in Louisville, *and in other places where* the *bank* shall appoint special agents for this purpose, upon the surrender of the certificates thereof."

How stood matters at the adoption by the President and Directors of this by-law ? The legislature, not deeming it expedient to enter into details as to the mode and place of transfer of the stock of the bank, gave that power to the President and Directors, to be exercised by by-law. This was in effect adopting, by anticipation, the mode and place of transfer determined on by the Board of Directors, which when prescribed became substantially a part of the charter. Suppose, instead of referring this matter to the President and Directors, the 26th section of the charter had declared that the stock of the bank should be transferable " at the bank in Louisville, and in other places where the bank shall appoint special agents for this purpose ?" Can any one doubt that the bank, that is, the President and Directors in lawful corporate meeting assembled, could by resolution appoint special agents where they pleased, and authorize them to receive and superintend transfers ? They certainly could have done so, and simply because the law gave them the power. Is not the result the same, if such a provision is passed by the body, to whom the legislature delegated the authority to regulate this minor branch of charter detail ? It was in pursuance of the authority so vested in them, that the board, on the 3d of December, 1835, " Resolved, That the President and Cashier be authorized and requested to establish transfer agencies in New York, Philadelphia, and New Orleans, under the laws relating to transfers."

Under this resolve, the negotiations with the Cashier of the Schuylkill Bank were commenced, which are said by the complainants to have resulted in the acceptance of the Philadelphia transfer agency by that bank. The letter of acceptance, addressed by the

Cashier of the Schuylkill Bank to the President of the Bank of Kentucky, was dated March 18, 1835.   On the 2d of April, 1835, at a meeting of the Board of Directors, "a letter from H. J. Levis, Esq., Cashier, was presented and read, stating the terms upon which the Schuylkill Bank of Philadelphia would accept the agency business of this bank in that city, and the President was requested to answer the same, accepting the terms proposed." The creation of this agency was thus the combined result of the charter, the by-law passed in pursuance of it, and the resolutions of the board carrying into effect the authority vested in them by the by-law. The charter gave the President and Directors authority to prescribe, by by-law, the manner and places of transferring the stock; the by-law passed in pursuance of it fixed absolutely one place of transfer, viz. the principal bank at Louisville, and one manner at all places, viz. by the holder or his attorney upon the surrender of his certificate;" and left the designation of other places of transfer, and appointment of agents to facilitate the same, to the bank; that is, to the President and Directors in corporate assembly met. To our judgment, the creation of the Philadelphia agency was in strict conformity with law, so far as respects " the officers and agents" making the contract on behalf of the Bank of Kentucky.

But it has been argued with great earnestness, that, admitting the Philadelphia agency to have been lawfully constituted, yet it was clothed with powers not contemplated by the charter of the Bank of Kentucky to be vested in any agent, to wit, with authority to issue certificates of stock to transferees. It is said, that from this indiscreet and unauthorized confidence, have arisen all the evils from which both banks have so much suffered. This power has been considered as furnishing the means of increasing the stock of the bank *ad infinitum;* as enabling the agent clothed with it to control all its franchises; and to make the bank just what he pleased. But all these consequences might have followed the necessary power of issuing new certificates of stock, held by the officers of the principal bank. Fraudulent and excessive issues of stock could just as well have been made at Louisville as in Philadelphia; if those possessing the means had combined with them the inclination to do so. We have seen, in the progress of this case, that enormous over issues of the Schuylkill Bank stock were perpetrated in that institution, when all the provided guards against such fraud ought to have been on the alert. All human agencies are liable to abuse; but, in spite of this vice in the nature of human agents, necessity compels us to resort to them in the conduct of human affairs. Whether the

U

authority given to its transfer agents by the Bank of Kentucky, to issue new certificates of ownership to the parties to whom the stock of the bank had been transferred at such agencies, was legal, is a dry question of charter power. It is to this that we must look in determining the existence or non-existence of the required authority for the act complained of. On recurring to this sole source of legitimate information on the subject, what do we find? The charter in terms declares that the stock of the bank shall be assignable and transferable "in *such manner*, and *in such places* as the President and Directors shall by their by-laws prescribe." We have seen that the 12th by-law prescribes that the stock shall be transferable "at the bank in Louisville, and in other places where the bank shall appoint special agents for this purpose, personally by the stockholder, or his attorney, upon the surrender of the certificates thereof."

The 13th by-law, which more especially refers to the immediate subject in hand, declares that, "in places where the *bank* shall appoint an agent for this purpose, an assignment or transfer endorsed upon the certificate, signed by the principal or his attorney, and attested by the agent, shall be of the same effect as if the stockholder, or his attorney had personally executed and delivered the same at the Bank of Kentucky."

Under these provisions of charter and by-laws the bank appointed a special agent in Philadelphia, and authorized that agent to receive the old certificates from the transferers, and issue new ones to transferees. Nothing ·is said which confines the issue of new certificates, on any change of ownership of stock, to the principal bank in Louisville. This might, as things have resulted, have been a safer course for the bank; rendering frauds, such as are here complained of, more difficult. But at the same time it would have embarrassed the marketable quality of the stock. A purchaser of bank stock wants the immediate evidence of his title; a seller the means of immediately consummating his bargain and realizing its fruits. The fluctuating value of the thing renders the prompt closing of all bargains in it necessary. A transfer agency of stock, without power to issue new certificates to purchasers on receiving the surrender of old ones from sellers, would be devoid of a most vital element of its usefulness. The right to invest an agent with such a power arises from necessary and natural implication. Where power is given to a corporation to constitute an agent for the transfer of its stock, the grant embraces all the usual and accustomed means of carrying the specific authority into effect. If authority

for every incidental and occasional act performed by a corporation is to be sought for and found in the words of its charter, acts of incorporation must swell into codes, and these framed with consummate accuracy; or the corporation would be perpetually at fault in its simplest movements. The remoteness of the principal bank from New York and Philadelphia, where its stock was chiefly held, most clearly indicated the necessity and propriety in the creation of transfer agencies in these places, of investing them with all the power the bank could impart, to render transfer simple, facile, and perfect. It is true that the 13th by-law goes somewhat into the details of the agent's mode of proceeding in supervising transfers. But there is nothing in it, incompatible with authorizing him to give the purchaser of stock a certificate of his ownership, when the old holder has transferred it to him in the mode prescribed by the by-laws. In neither charter nor by-laws do we find anything about issues of new certificates on the transfer of old ones, whether at the principal bank or anywhere else. So much a matter of course does it seem, that when old certificates are assigned and surrendered, new ones should issue to the proprietor of the stock.

But, even admitting the 26th section of the charter of the Bank of Kentucky and the by-laws passed in pursuance of it, could be construed as requiring each appointment of a special transfer agent to be the subject of a special by-law; and as making new certificates on the surrender of old ones issuable only by the principal bank at Louisville; such provisions would seem to be but directory, and not prohibitory. And if a regulation be merely directory, then any deviation from it, though it may subject the officers to responsibility to the government and stockholders, *cannot be taken advantage of by third persons:* U. S. *v.* Kirkpatrick, 9 Wheat. 720; U. S. *v.* Vanzandt, 11 Wheat. 184; Bank of U. S. *v.* Dandridge, 12 Wheat. 64. "There is a known distinction," says Lord Mansfield, in Rex *v.* Loxdale, 1 Burr. 447, "between circumstances which are of the *essence* of a thing required to be done by an act of parliament, and clauses merely directory." What are deemed such provisions must depend on a sound construction of the nature and object of each regulation, *and of public convenience* and apparent legislative intention: Bank of U. S. *v.* Dandridge, 12 Wheat. 64. Again, these exceptions, if sustainable, would be instances of passing the exact line of corporate power, for which Chancellor Kent, in the Silver Lake Bank *v.* North, 4 John. C. R. 373, says, it would rather belong to the government of the state creating the

corporation to exact a forfeiture of charter, than for the forums of another state, in which the corporation is a suitor, in a collateral way, to decide a question of misuser, by setting aside a just and *bonâ fide* contract.

It being, therefore, the opinion of the Court, that there was nothing to prevent the Bank of Kentucky, as a corporation created by the laws of another state, from making such a contract in Pennsylvania as that charged in the bill, and that the contract, if in fact entered into, was in conformity with its charter; it remains to be inquired into, whether there is anything in the contract so incompatible with the positive laws or general policy of Pennsylvania, as a sovereign state, to require her Courts to refuse their aid in its enforcement. Undoubtedly, if such is its character, it cannot receive our recognition. The only positive laws urged on us as producing this result, are found in the 2d section of the Act of the 28th of March, 1808, 4 Smith's Laws, 556, and in so much of the 13th section of the Act of the 21st of March, 1814, 6 Smith, 167, as remains in force. The Act of March, 1808, simply declares, " that no company incorporated by the laws of any other of the United States shall be permitted to establish within this Commonwealth any banking house or office of discount and deposit." On this law, it seems enough to remark, that the Bank of Kentucky, in creating a mere transfer agency of her stock in Philadelphia, has done nothing which is here prohibited. The 13th section of the Act of the 21st of March, 1814, so far as it is in force, enacts, that " all notes taken by and discounted, and all contracts relative to banking business usually done by banking companies, made by any unlawful and unincorporated bank, individual, or corporation not incorporated for banking purposes, shall be absolutely null and void, and shall have no effect whatever in law or equity, and be irrecoverable in any Court in the Commonwealth." But the Bank of Kentucky is no " unlawful and unincorporated bank issuing orders or notes in the nature and manner of bank notes," for circulation in Pennsylvania. This is the class of offenders—well known at the time the law passed—which it was enacted to suppress. It was never intended to prevent the lawfully incorporated banks of other states from making contracts having no reference to the matters interdicted by it. The evil this law sought to remedy was the worthless paper with which the state was flooded at the time of its passage. A war of extermination was declared against the issuers and recipients of it. The exclusion of both from the aid and protection of courts of justice, in all contracts arising out of any of these unlawful banking

transactions, was a strong measure; too strong to be long adhered to. Hence the early repeal of so much of the law as rendered the bankers irresponsible for their notes; and the retention of it against them, seeking to enforce contracts in their favour, which spring out of their lawless banking. This law fulfilled its mission, and, until aroused for the purposes of this case, slumbered in the statute book.

But the course of state legislation, as indicated by the Acts commented upon, as well as by the repealed Act of March 19, 1810, 5 Smith, 108, has been urged on the Court as manifesting a settled course of public policy, sufficiently distinct without any positive prohibitory provision, against the establishment of such an agency as that in question, by a foreign corporation, within the Commonwealth. Questions of public policy are rarely judicial questions. The policy, indeed, which prevents the assertion of a civil right, where the cause of action arises from doing something directly injurious to the public, or declared so by positive law, is readily appreciable. But, generally, this is ground on which the judiciary should move with intense caution. Otherwise, the rights of the citizen might have no other guarantee than the soundness of judicial discretion. There may be occasions in which the policy of a government is so evident, from the whole scope of an uniform and consistent system of legislation, and from the nature of its fundamental institutions, that a special law indicating this policy will not be required by the judiciary in order to the conservation of such policy. When so manifest, the policy of the government becomes part of its code, and of consequence all contracts in the state repugnant to it are illegal and void: Augusta Bank v. Earl.

If the establishment of this agency could be regarded as the establishment of a bank, a case would present itself for the maintenance of our state policy on this subject. But it had none of the fundamental characteristics of a bank. The essential elements of banking are discount, deposit, and circulation. With neither of these had this agency any connexion. In the existence of such an agency, I can see much to advantage and nothing to injure our citizens. Its object was to facilitate the business operations of Pennsylvania buyers or Pennsylvania sellers of the stock of the bank. It enables the seller the more conveniently to convert his stock into money, when his emergencies require it; and it promptly furnishes the purchaser with his evidence of title to the thing he has purchased. Without the existence of such a facility, such delays might intervene between the inception and consummation of a

contract of purchase and sale of such stocks, as would entirely defeat it. Their prompt convertibility into money is a vital element in the value of all stock investments. In creating an agency for this purpose, the Bank of Kentucky rather consulted the advantage of her foreign stockholders than her own. It was an operation having no necessary connexion with its regular banking concerns; seeing that its charter had provided a mode of transferring its stocks in the sovereignty which created it. If we admit that a corporation created by the laws of a sister state, can make *any* contract through its agents in this state (and, since the case of the Augusta Bank *v.* Earl, that is not an open question), then is a contract for the execution of such an agency a valid one between parties capable of contracting. It neither violates any positive law, nor is it inconsistent with any such broad and distinctive principle of the public policy of Pennsylvania, as would justify a judicial tribunal in pronouncing for its nullification.

The right of the legislature, by future enactment, to declare such agencies illegal, is not questioned. We have frequently, by express legislation, excluded certain action of foreign corporations in the state, such as insurance and banking. But the prohibition of some contracts made by foreign corporations, seems necessarily to imply the legality of others not embraced in the prohibition. The language of all these prohibitory acts most clearly-indicates that the contracts forbidden by them might lawfully have been made before these acts passed.

Having thus disposed of the inquiries involving the right of the Bank of Kentucky to create such an agency in Pennsylvania, and to make all necessary contracts in relation thereto with any party capable of contracting, we are brought to that point in the controversy which denies that the President and Directors of the Schuylkill Bank could lawfully enter into such a contract on behalf of that institution.

This position is supported on the grounds that the contract was for an object subversive of the positive law and general policy of Pennsylvania; and that at all events it is a contract which the President and Directors of no banking company could lawfully enter into, being inconsistent with the ends and objects of such a corporation.

The first of these objections has been disposed of in the precedent observations of the Court, and requires no farther notice. The second, viz. the incapacity of the Schuylkill Bank to make such a contract consistently with her charter, is emphatically the

point of the case; and seems most relied upon.   In the demonstration of this objection, certain principles have been assumed, from which the result sought for by the defendants is supposed to be necessarily deducible.   In these, as principles, the Court in general concur.   The differences between us and the defendants' counsel arise from their application to the facts of this case, and from the modifications produced by its peculiar specialities.

A corporation, being a mere creature of law, possesses only those faculties which are imparted to it by the charter of its creation, either expressly or impliedly, as necessary to its existence. Implied are, however, as much granted as express powers.   If a banking or other corporation could do no act except such as is in terms prescribed in its charter, its movements, for all practical purposes, would not last for a day.

Thus, it is not necessary that the act of incorporation should give a bank particular power to receive deposits, to enable it to do so.   It is sufficient that this is the ordinary course of banking business; and such a corporation, by the mere grant of a charter for that species of business, is empowered to conduct it in all its branches, unless expressly restrained: Foster *v.* The Essex Bank, 17 Mass. Rep. 497, 8.

By the grant of a bank or other charter, all the incidental and necessary faculties required to carry the expressly granted powers into effect are implied.   It may be asked, who are to be the judges of the rightfulness of the powers claimed as incidental to the main grant?   Not the corporation, certainly, but the sovereignty by whom the franchises of the corporation have been given—exercised through its judicial tribunals, or by the law-making powers, where they have reserved the right of revoking their grant for any abuse of franchise.   All claims of corporate powers, derived from implication, undoubtedly require close scrutiny; but in the nature of things such must exist: and their liability to abuse affords legitimately only reasons for their cautious recognition.   Charters of incorporation are constitutions, not codes.   They furnish outlines, which those who are to execute their faculties are at liberty to fill up, but always in harmony with the main design.

It is true that the directors of a bank are but its authorized agents, and that they can incur no obligation binding on the corporation, except while acting in the mode prescribed by, and within the limits of the charter.   The corporation is altogether a distinct body from the directors.   So far as the act incorporating the Schuylkill Bank delegates authority to the directors, they possess

and may exercise it; not as constituting the corporation itself, but as its statute agents; the directors being a board, and not a corporate body: U. S. Bank *v.* Dandridge, 12 Wheat. 64; Dana *v.* The Bank of U. S., 5 Watts & Serg. 267; Salem Bank *v.* Gloucester Bank, 17 Mass. Rep. 29, 30. But the *management* of the affairs of the bank is committed to them by the express terms of the charter. They are made the representatives of the corporation, with plenary power to regulate its concerns according to their best discretion and judgment: Dana *v.* Bank U. S., 5 W. & S. 246. Being but agents, they cannot exceed the authority granted by the charter. If they do, their principal is not bound by their unauthorized acts.

Having regard to these fundamental principles, we proceed to the solution of the single proposition involved in this branch of the case. Was the acceptance of the transfer agency of the Bank of Kentucky, by the Directors of the Schuylkill Bank, supposing them for the present to have accepted it, consistent with the end and object of the charter of the latter?

The counsel of the defendants, claiming to represent the corporation, repudiate such a contract, as a thing pertaining to none of the proper faculties of a bank, and as discrepant with the spirit of its charter, which interdicts the corporation from buying or selling merchandise or stocks. It is compared to a general mercantile agency, which the bank confessedly could not lawfully execute. If such in point of fact is the true character of this agency, the reasoning of the defendants is conclusive as respects the original invalidity of the contract. But can this agency be fairly so characterized? The first process in this inquiry, is the exact ascertainment of what the mutual contract between these banks actually was. This is found in the final arrangement made between them through Mr. Wm. Riddle, which was a modification of that entered into in the origin of the agency. By this contract the Schuylkill Bank was not only to act as transfer agent to the Bank of Kentucky, but agreed to collect instalments of her stock and pay dividends; to collect bills and notes payable in New York, Philadelphia, Boston, Baltimore, &c.; to redeem the post notes of the Bank of Kentucky payable at the Schuylkill Bank, and to allow the Kentucky Bank to overdraw to the extent of $150,000 on an emergency, she paying interest thereon. The Bank of Kentucky agreed to collect for the Schuylkill Bank, bills or notes payable at Louisville and in the interior towns of Kentucky where it had branches; and bills and notes payable in any of the western cities or towns where banks were

located. If we except the transfer agency from the agreement, we see nothing in it but the ordinary and every-day arrangements between banks for mutual facilities in the transaction of their affairs; arrangements which enable banks to render real benefit to the extensive and increasing business relations subsisting between the different sections of the union. All this is undisputed. But the transfer agency is said to be the poisonous element in this contract. What is a transfer agency? It is a very harmless thing. It amounts to nothing more than the witnessing of the conveyance by one person to another, of personal property, viz. stock of an incorporated company; and in this case also to furnishing the purchaser a certificate of ownership of such stock, on the surrender of a previous certificate of like character held by the seller. This is very simple business, involving little or no risk or hazard; requiring nothing but ordinary care and fidelity in its performance. If the necessities of one bank require its stock to be transferable in another place, whether in the state of its creation or out of it, why cannot it ask aid of a correspondent bank that does all its other business in such place? And why cannot such correspondent-bank afford the aid required? In the charter of the Schuylkill Bank there is found nothing in terms forbidding the execution of such a friendly office, either to another bank of our own or of a sister state. For let it be remembered, that if it is unlawful for a bank to act as transfer agent for another, it is immaterial whether that other is a bank of our own or of another state. It is the want of congruity with banking functions that must make such a contract illegal; not the locality of the corporation for which the business is done. If *not expressly* forbidden, any implied interdiction must spring from not being a contract necessary or usual in the course of banking business. To this extent the implied power of making contracts resident in all corporations certainly goes: Angell & Ames, 200. The necessity of making such a contract for the benefit of her distant stockholders, was matter for the Bank of Kentucky. Its usefulness to them, however, is self-evident. So far as respects the corporation of the Schuylkill Bank, the material question is, whether a contract entered into by her directory agreeing to accept such an agency for another bank, was an *usual* and *accustomed contract* among banks, that maintain general business relations with each other. Such usages spring out of necessities, and are the best evidence of them. As the customs and usages of trade, are part and parcel of every mercantile contract, so a course of uniform usage, in favour of a particular course of business, prevailing among

all banks, foreign and domestic, known to every business man, never called in question by government, never repudiated by stockholders, is stringent evidence of such a course of business being within the necessary implications of all bank charters. On this point the testimony affords the fullest light. We have it in proof from the testimony of Mr. Macalester, that the Girard Bank acted as transfer agent of the Northern Bank of Kentucky, of the Commercial Bank of Vicksburg, of the Bank of Manchester, Miss., of the Commercial Bank of New Orleans, and of the Commercial Bank of Cincinnati. The Commercial Bank of Philadelphia acted as such agent for the New Orleans Canal and Banking Company; the Farmers and Mechanics Bank of Philadelphia for the Bank of Memphis, and the New Orleans Gas-Light and Banking Company; the Philadelphia Bank for the Union Bank of Tennessee; the North America Bank for the Agricultural Bank of Mississippi, and of the Bank of Louisville. In the proofs of this case, is also found the fact, that when the Kentucky Bank decided on withdrawing its agency from the Schuylkill Bank, the United States Bank agreed to receive it. At *this time* the Philadelphia Bank is acting as transfer agent of the debt of the United States, without, we presume, any idea being entertained by the bank directors that they have forfeited their charter by the acceptance of such an agency, or by the government that the corporate funds of the institution are not responsible for any fraud or neglect in the execution of the trust.

In New York, we find from the testimony of Mr. Ebbetts, Cashier of the Union Bank, and Mr. Shannon, its former book-keeper, that it is a usual thing for banks in that city to accept and execute such agencies, and that there is no special clause in New York bank charters authorizing them to do so. In aid, therefore, of our own usage on the subject, we have that of the great commercial and monetary capital of the nation. In this connexion, the fact may be referred to, that the original and late Bank of the United States acted as Commissioner of Loans for the government, and that the Bank of Pennsylvania is by law the transfer agent of the state stock. These duties were indeed *imposed* on these institutions as charter duties by government, but this manifests the general impression of the congruity of such functions with bank operations. In the face of an usage so broad and general, prevailing alike at home and abroad, it would be a harsh rule that would now declare such contracts void, and the charters of those banks forfeit, which have entered into them in good faith, resting on the universality of such contracts among banks, and the general acquiescence of government

in their regularity.    And this for no other object than to save the
Schuylkill Bank from the consequences of a breach of a fair con-
tract.    So far, however, has the government of Pennsylvania been
from treating or regarding the acting as such an agent as inconsistent
with the charter of the Schuylkill Bank, that the legislature have
actually provided by law, facilities to enable the Kentucky Bank
to obtain a legal remedy for the breach of duty as her transfer
agent, charged on the Schuylkill Bank.    Certainly, if this law is
effective for no other purpose, it manifests the sense of the sove-
reignty which chartered the Schuylkill Bank, that its faculties
enabled that corporation to make this contract.    So far, the law
of 1842 may be regarded as declaratory, and as affirmative of the
settled usages of the banks of the state.    In a case so circum-
stanced, if the Court doubted on this question, which they do not,
they would follow the prudent precedent of Chancellor Kent, in the
Silver Lake Bank *v.* North, and leave the government to determine
whether a forfeiture should be executed, rather than in a collateral
way decide a question of misuser by setting aside a just and *bonâ
fide* contract : Gordon *v.* Preston, 1 Watts, 387 ; Quincy Canal *v.*
Newcomb, 7 Metcalf, 276 ; Leazure *v.* Hillegas, 7 S. & R. 313.

We have thus progressed in this investigation, until we have
ascertained that the contract for the creation of the Philadelphia
agency of the Bank of Kentucky was, if in fact entered into, a per-
fectly lawful contract in both contracting parties ; inconsistent with
no law of either state, and perfectly within the legitimate scope of
authority possessed by the directors of both banks.    The next sub-
ject of inquiry would seem, naturally, to be whether such a con
tract was entered into in fact, and whether any, and what breach
of it, for which they are legally responsible, has been committed
by the defendants.    But preliminary to this, certain legal points
raised by the defendants require to be disposed of, as some of them,
if sustained, will either totally defeat or extensively modify the
complainants' claim to relief.    These will be met and considered
in the order best calculated for clear appreciation.    They are too
numerous to permit much prefatory introduction.

First, it is contended, that the contract for this agency being
made by the president and directors of an incorporated bank, it
became, from a necessity, equally known to both parties, requisite
to employ the assistance of sub-agents in its execution.    That the
cashier of the Schuylkill Bank was the sub-agent, so chosen by
that corporation with the assent and approbation of the complain-
ants ; that all the frauds charged in the bill were perpetrated by

him without the conusance or connivance of the President or Directors of the bank; and that under such circumstances, the bank is no farther responsible for his acts than arises from the general obligation of every principal agent to act with good faith and ordinary care in the selection of a secondary agent. The principle on which this position rests, is the familiar one, that where it is usual and necessary for a principal agent to employ a sub-agent, as, for example, a broker or an auctioneer, to transact the business, in such a case, the principal agent will not ordinarily be responsible for the negligence or misconduct of the sub-agent, if he has used reasonable diligence in his choice as to the skill and ability of the sub-agent. But, indisputable as is this principle, it has no relevancy to an agency like the present. The cashier of a bank, while carrying into execution, under the orders of the directors, a lawful contract, such as the contract creating this agency is shown to have been, is in no sense of the word a sub-agent of the board of directors. He is a statute officer, not of the directory, but of the corporation, lawfully empowered to carry the contracts of the corporation into execution, as the directors are lawfully authorized to make them, when acting within the sphere of their authority derived from the corporation: Bank of Washington v. Barrington, 2 Penn. Rep. 40. Although a bank corporation is compelled, by the incorporeal nature of its essence, to act by others, yet, when these are part of its organic machinery, like its cashier, it is as much responsible for their omissions and commissions, as is a natural person who employs assistants in the execution of any commission. So far has this liability been extended, that it has been held where the owner of a house employed an agent to repair it, and the latter contracted with C. to do the work, and with D. to furnish materials, and D.'s servants, by negligently leaving materials in the street, occasioned an injury to the plaintiff, he was entitled to maintain an action for damages therefor against the owner: Bush v. Steinman, 1 Bos. & Pull. 409; Story on Agency, § 454. The agency of the assistant is but an instrument, and every man having authority over the actions of another, who either expressly commands him to do an act or puts him in a condition of which such act is the result, shall be responsible for the act of his servant, as if it were the act of himself. Where a principal agent in the execution of his agency is obliged to employ external aid, where he is compelled to resort to the functions of a third person in the completion of business of the agency, with whom he has no connexion, and over whom he has no

control, a different standard of responsibility prevails. Such is the case where a principal agent, to sell goods, is, by the course of trade, necessitated to employ a regular broker or auctioneer to make the sale. Law and reason alike limit his responsibility for the acts of the third person thus necessarily introduced, to care and diligence in the selection of an apparently proper person for the purpose required. In fact, when the business of the agency has reached that point, the principal agent is not an agent so much to sell, as to select on behalf of his principal, some one competent to execute a necessary function for him, which the agent cannot perform himself; and all the cases referred to in this connexion, are but various developments of this common principle. But was it ever heard of, that an agent charged with negligence or fraud, could relieve himself from liability to his principal, by showing that his clerk or his porter were the immediate actors in the wrong, and acted without his authority? If such metaphysical niceties would be at once repudiated in a natural person, why should they be recognised in a corporation?

After the authoritative enunciation of such a doctrine, there would be found few rational persons dealing with banks. It would sweep away at once every substantial liability of these corporations, and leave all persons, unwise enough to deal with them, at the mercy of every subordinate in their employ. But no such doctrine exists. Persons, natural and artificial, in this respect, stand on the same broad platform. Whenever either enters into the execution of an agency to be performed by themselves and within themselves; or to be consummated by some third party with whom they have no connexion, and over whom they have no control, but who is resorted to from the necessities of the business of the agency, each is under the same exact measure of responsibility to the principal. No less, no more. The difference between them lies in the manner of contracting for and executing the agency, not in the legal extent of the obligation when assumed. The natural person contracts and performs personally : the artificial person contracts and performs through its corporate functionaries. A corporation can no more contain within itself the function of a primary and secondary agent than can a natural person. The case of Bellemire *v.* The Bank of the United States, 4 Whart. 112, is entirely reconcilable with these principles. But this doctrine of bank officers being but sub-agents of the directors, if it could be true as to subordinates, would not be so as to the cashier. He is the executive officer of the bank. Though chosen by the directors, he is as much the sta-

31                 X

tute agent of the corporation as the directors themselves. This was so directly ruled by Mr. Justice Rogers in the Bank of Washington *v.* Barrington, and his opinion was sustained by the Supreme Court in banc. If the corporation is under only the limited liability for his acts as contended ; by parity of reason, it is no further responsible for the acts of its other statute agents, its directors. Yet we presume it will not be pretended, that a bank is not directly and primarily responsible for the acts of its directory, done in the execution of a function within the scope of the authority confided to them. So far has this liability been extended, that where a bill of exchange was sent to *one* of the directors of a bank, to be discounted. for the benefit of a drawer, and a director, who was a member of the board which ordered the discount, received the avails, alleging the discount to have been made for his benefit, the bank was held chargeable with knowledge of the fraud, and could not recover on the bill against the drawer : Bank of the United States *v.* Davis, 3 Hill's N. Y. Rep. 464, 465. The principles on which Chief Justice Nelson puts this case are, that in case of a joint agency by several persons as the directors of a bank, notice to any one, or the acts of any one, while engaged in the business of the principal, is notice to the bank itself; *that the corporation is acting and speaking through the several directors who jointly represent it in the particular transaction.* In judgment of law it is present, conducting the business of the institution itself; ·the act of the several directors being the acts of the bank, their knowledge, the knowledge of the bank, and notice to them, notice to the bank. So, in our opinion, the acts and doings of a cashier, carrying into execution a lawful contract entered into by the bank, that is, by its board of directors, are the acts and doings of the bank itself, for which the corporation is responsible to all parties aggrieved by them. It is needless to dwell on the argument, that the Cashier of the Schuylkill Bank was the selected agent of the Bank of Kentucky ; and that after the first proposal for the establishment of the agency, the Bank of Kentucky enhanced his powers, and gave him increased facilities for mischief, by permitting him to retain the original certificates surrendered, and by authorizing him to issue new certificates. If he was selected and confided in by the Bank of Kentucky, it was as Cashier of the Schuylkill Bank, with which it proposed contracting ; and if there was any modification in the original scheme of the agency, it was one which came to the knowledge and met the approbation of the board, or the complainants' case must fail for want of proof. The last obser-

vation seems a suitable introduction to another subject much discussed, viz. whether the Cashier of the Schuylkill Bank could, *ratione officii,* and without previous special authorization, or subsequent ratification of the directors, bind the corporation by entering into this contract of agency. If this was truly a turning point in the cause, it might present embarrassing difficulties in the way of the complainants, if required to establish the affirmative of the proposition.

The *ex officio* authority of a cashier to bind the bank, is only such as he is held out to the public to possess according to the general usage, practice, and course of business of such institutions; and his acts within the scope of such usage, practice, and course of business, bind the bank in favour of third persons having no knowledge to the contrary: Story on Agency, § 114. In the scope of *ex officio* authority, the right to contract for such mutual agencies as are said to have existed between the Banks of Schuylkill and Kentucky, does not seem embraced: Foster *v.* Essex Bank, 17 Mass. Rep. 505; Salem Bank *v.* Gloucester Bank, Ib. 1; Bank of U. S. *v.* Dunn, 6 Peters, 51; Bank of Metropolis *v.* Jones, 8 Peters, 12; Stewart *v.* The Huntington Bank, 11 S. & R. 267. But this question is of no practical materiality in this case; because the complainants rest on having, as they suppose, established that the Board of Directors of the Schuylkill Bank, both by previous command and subsequent ratification, authorized the contract for the establishment of this agency. If this be so, and if the Cashier was charged with the execution of it, when so made, the corporation is most clearly liable to third persons for the consequences of his acts. The right to make it, involved the right of assigning its performance to the executive officer of the bank, and from both spring the corporate liabilities of the bank for all neglects and frauds in its execution. The criterion of the liability of principals for the acts of agents is simply whether they were done in the exercise, and within the limits of the powers delegated: Mechanics' Bank *v.* Bank of Columbia, 5 Wheat. 326. In this connexion the point made, that this agency, even if undertaken by the Schuylkill Bank, was a gratuitous agency, in the execution of which the agent is only chargeable with gross negligence, may be noticed. And this is sufficiently done by simply showing that this was not a gratuitous agency. The original contract included a charge of $500 per annum by the Schuylkill Bank for clerk hire, employed in the execution of the business of the agency. When this arrangement was modified, the contract between these banks was one of great mutual advantage, and formed full

legal consideration for the services the one bank was to render to the other. The collection, free of charge, of all notes and bills in Kentucky, where the Bank of Kentucky had branches, and in all the western cities, free of charge, except in the instances where the Bank of Kentucky had to pay charges for such collections, were great advantages to any eastern bank, which, by the course of trade, is the agent of the creditors of western purchasers. The facilities offered by such an agency in collecting western debts due to eastern merchants, were calculated to give the eastern bank, having such agency, extensive popularity and usefulness; tending to increase its business in all its active and beneficial branches. In Smedly v. The Utica Bank, 20 Johnson, 372, the benefits resulting to banks from such collections were considered, and the advantage accruing to a bank, from the avails of paper remaining on deposit when collected, was held a good consideration for an implied under-taking on the part of the bank, to give notice of the default of the maker to the endorsers of a note deposited by a customer for col-lection. The whole reasoning of the Court may be advantageously referred to, as illustrating the benefits derived to banks from being collecting agents of their customers. The more extensive the facilities for these important commercial conveniences, the greater must be the benefits derived by the bank from affording them to their customers.

The conclusions arrived at, that the Schuylkill Bank, if respon-sible at all for the defaults charged in the bill, is chargeable as a direct and paid agent, supersedes the necessity of examining into the question, as to what would be regarded to be good faith and ordinary care, in the selection and supervision of sub-agents by a primary agent, or of subordinate officers, employed in the execu-tion of a gratuitous trust; or the question, how far these obliga-tions have been faithfully executed in this case by the Schuylkill Bank. If the Schuylkill Bank was the transfer agent of the Bank of Kentucky, she was a direct and paid agent, and is under all the legal obligations imposed on such agents.

We now approach a series of cognate objections to the complain-ants' recovery, which may be conveniently grouped together. Of these, first, it is said, that at the time of the filing the original bill, the Bank of Kentucky had no claim in its own right against the Schuylkill Bank. That at that time the bank had suffered no injury, lost no property. That, if injury was done by the issue of the spurious stock, it was to the purchasers thereof; and that, until the Kentucky Bank had been, by operation of law, made responsi-

ble for these frauds of its agent, it had no claim for reclamation and indemnity against such agent. This question arose, and was in substance disposed of, in considering the claim of the complainants to equitable relief in the case made by their original bill. We there held, that, admitting the Schuylkill Bank to have been the actual and legal transfer agent of the Bank of Kentucky, and as such to have fraudulently over-issued its stock to *bonâ fide* purchasers thereof, that the bank was entitled to file its bill, *quia timet,* which the Court would retain, and from time to time, either through a reference, or by a *quantum damnificatus*, give relief to the extent of the loss it was shown to have sustained by the frauds of its agent. Or that, if this could be questioned, the Act of 1842 gave the complainants on their amended and supplemental bill an unquestionable *status* in the Court.

As, however, the claim of the bank to *actual* indemnity in its own right arises from its legal liability for the frauds of its agent, and from its having legally responded therefor to the holders of the spurious stock, undoubtedly, having voluntarily compensated these holders, the bank must show that such compensation was legally as well as actually made. That such compensation was legally made to the holders of the spurious stock by the Bank of Kentucky, is denied by the defendants; and it is argued that, if actually made by the bank, it was purely a gratuitous act, done from considerations of mere policy, and therefore affording no action over against the defendants. In sustaining this position, the defendants insist, first, that the holders of the spurious stock had certainly no claim against the Bank of Kentucky for specific genuine stock, in lieu of the spurious stock held by them; because the capital stock of the Bank of Kentucky was limited by its charter to *fifty* thousand shares, which being filled up by private subscription and the amount reserved for the state, no greater number could be created for any purpose by the corporation without legislative authority. It is true that no act of a corporation can enlarge its chartered authority, either as to the subjects on which it is intended to operate, or the property of the corporation. If created with a fund limited by the Act, it cannot enlarge or diminish the fund but by license from the legislature; and if the capital stock has been parcelled out in a fixed number of shares, this number cannot be changed by the corporation: Salem Mill Dam Corp. *v.* Ropes, 6 Pickering, 32. If, under any pretext, a corporation was permitted to increase its capital stock, it would afford ready means of creating this great element of corporate power at pleasure, in the face of the express limitations of its

charter, that its capital should be so much and no more. Were this point of any practical value in the cause, the inclination of the Court, as at present advised, would be with the defence. But it is not. If the holders of the spurious stock had *any* remedy against the complainants for the wrongs they suffered through the instrumentality of their transfer agent, that would suffice for the purposes of this case. This, however, is also denied by the defendants, who insist that the holders of the spurious stock had no such remedy, against the *corporation* of the Bank of Kentucky. And this because the purchasers of this stock, knowing the transfers to them were made by an agent, were bound to look to the authority of such agent; because the Directors of the Bank of Kentucky exceeded their charter powers in creating such an agency; because the agency, if authorized, was not created in the mode prescribed by the charter; because, by the terms of the charter, a certain act was to be done before issuing new certificates, viz. the surrender of old ones, which the transferees were bound to see complied with by their transferers before accepting new certificates; and that the omission of the holders of the spurious stock to see this charter requisition complied with, enabled the agent to perpetrate all the frauds complained of.

It is a universal rule in the law of agency, that, in order to bind a principal upon a contract made by an agent, the contract must be within the authority committed to the agent; and the authority must be strictly followed. The purchaser under a special power is presumed conusant of its extent, if contained in an instrument creating the power; and if he purchases in cases in which the special authority is not pursued, he purchases at his peril. "The general rule," say the Court, in the North River Bank *v.* Aymer, 3 Hill, N. Y. Reports, 266, "that when an attorney does any act beyond the scope of his power, it is void as between appointee and principal, has always prevailed, and is even elementary in the doctrine of powers. The ground on which the rule rests is familiar. The appointee need not deal with the attorney unless he choose ; and it is very reasonable that he should be bound to inspect the power, when in writing, or to learn its language in the best way he can, when it is by parol. On becoming acquainted with it, he shall be holden to understand its effect, and must see at his peril that the attorney does not transgress the prescribed boundary in acting under it." It is because we differ from the defendant as to the authenticity of the act creating this agency, and as to the effect of the supposed limitations in the authority of the agent in con-

ducting the transfers, that we regard these clear principles irrelevant.

That the Directors of the Bank of Kentucky had the charter right to create this agency, and that possessing they exercised it in conformity with the charter, has been already determined under a previous head of inquiry. And while it is true, that, in making a regular transfer of the stock of the bank, the principal bank at Louisville, and all its transfer agents, wherever situate, were required to receive the surrender and assignment of the preceding certificate from the holder thereof, it is not true that the purchaser of the stock of the bank is under any obligation to see that such surrender is made by the seller.

The obligation to surrender the old certificate, is not a limitation on the power of permitting transfers, so far as respects the bank. It is a provision introduced for the security of the bank, in order to prevent its being embarrassed between legal and equitable titles to its stock, and in order to secure to the bank any liens or claims on its stock, before transfer to third persons having no notice of such liens or claims. It is a provision almost if not quite universally introduced into American bank charters, or into by-laws made pursuant to them. It has been held, that a by-law requiring any extraordinary formality, or imposing an impediment in the transfer of shares, would be void: Sergeant v. Franklin Insurance Company, 8 Pickering, 90. In Pennsylvania, our bank charters provide that no stockholder indebted to a bank for a debt due and unpaid shall be authorized to make a transfer or receive a dividend until such debt is discharged: See Union Bank of Georgetown v. Laud, 2 Wheaton, 390. As between *vendor* and *vendee*, however, a transfer of stock will be valid, though the act of incorporation provide that no such transfer shall be valid or effectual till registered in a book kept for the purpose, and the debts due to the company be first paid: Grant v. Franklin Ins. Co., 8 Pick. 90; Bank of Utica v. Smalley, 2 Cowen, 770. In Grant v. The Mechanics' Bank, 15 S. & R. 143, Tilghman, C. J., says, that "this restraint on the transfer of stock was intended for the benefit of the bank." How then can it be pretended that a purchaser of bank stock has any obligation imposed on him to see to the surrender of the old certificate and its due assignment, when that is a matter for the interest and consequent supervision of the bank itself, and provided and exclusively intended for its advantage? When he receives his new certificate, has he not the right to assume that the bank has attended to all things in the transaction neces-

sary for its own protection ? Who conducts the preliminaries resulting in the issue of his new certificate? Why, the bank itself, or, what is the same thing on this occasion, its agent lawfully constituted for this purpose. The idea that the purchaser of stock is to lose the property he has honestly paid for, because the bank has not done its duty to itself, is unreasonable to the last degree. It would seem strange indeed to an unsophisticated understanding, if such a notion could be invoked successfully to save the Bank of Kentucky from the results of its own misapplied confidence in a faithless agent. The true doctrine on this subject is, that, where one of two innocent persons is to suffer from the tortious act of a third, he who gave the aggressor the means of doing the wrong must alone bear the consequences of the act. If, therefore, the Bank of Kentucky was responsible for the frauds of its agent, there is nothing in the circumstances under which the holders of the spurious stock obtained their certificates which exempts it from this liability. The Schuylkill Bank, if the view taken of the proof by the complainants is correct, was the general agent of the Bank of Kentucky for the transfer of its stock; for a general agency exists where there is a delegation to do all acts connected with a particular business or employment: Story on Agency, § 17. And we have seen that the principal is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other misfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify, or participate in, or indeed know of such misconduct, or even if he forbade or disapproved them : Story on Agency, § 452 ; Paley on Agency, by Lloyd, 294–6, 301–7 ; Bank of the U. S. v. Davis, 2 Hill's N. Y. Rep. 451 ; Horn v. Nicols, 1 Salk. 289. The principal holds out his agent as competent, and fit to be trusted, and thereby in effect he warrants his fidelity and good conduct in all matters of the agency. The Bank of Kentucky was then responsible for the frauds of its agent, whoever that agent was, and did no more than justice required and law would surely have coerced, when it compensated the holders of the spurious stock. And the bank has done this to the extent of between twelve and thirteen thousand shares, amounting at par value to a million and a quarter of dollars. And to this extent has she a present claim for reclamation on her faithless agent, in her own right, and not as representing any one else. When the original bill was filed, she was threatened with this liability. She has now actually incurred it; and her claim to present indemnity, on the principles

discussed and determined in the examination entered into on the outset of this judgment, is clear and irresistible.

- The greatness of this claim, and the admitted inability in the Schuylkill Bank to respond to it in full, render unnecessary much examination into another question discussed, viz. whether she has any, and what claim, as representing the holders of the spurious stock? While, in this branch of the argument, it seemed conceded that the parties to whom the transfer agent immediately issued spurious stock might have a remedy against such agent, it was denied that the assignees of such original holders had any such direct remedy against the agent and over against the principal. It was said that no privity existed between these assignees and either the agent or principal. That there was no such thing as the assignment of a warranty; no such thing as the assignment either in law or equity of a claim arising from a fraud. That each successive purchaser of such stock had his remedy against his immediate seller, and the agent and principal's liability were to the party imposed upon by the original issue of the spurious stock. If these ingenious subtleties were legal truths, and if the passage of the holders of spurious stock to justice was so complicated and involved by common-law technicalities, how necessary was equity jurisdiction to the attainment of a remedy in this case, and how right it was in the legislature of Pennsylvania to invest this Court with plenary power to right the wrongs of all the victims of this stupendous fraud, if we did not possess it before. But there is nothing in these niceties. On the occasion of every successive assignment of this so-called stock, new certificates issued to the transferees; and to the existing holders of these certificates the Bank of Kentucky must respond, whether the certificates were issued by the Philadelphia, New York, or any other transfer agency. No doubt some of these false certificates were sold in New York, and new certificates issued from that agency in the honest conviction that the former were what they appeared to be. For this no blame could be attached to the New York agency, which throughout acted with perfect fidelity. The *bonâ fide* holder of every certificate issued by either of these transfer agents, has a primary and direct claim against the Bank of Kentucky, either to be admitted as a corporator of that bank, or, if that is impracticable from the excessive issue of stock, to be compensated by the bank for the fraud practised upon him. In Davis v. The Bank of England, 2 Bingham, 393, 9 English Com. Law Rep. 464, although the question did not directly arise in the case, the Court of Common Pleas in delivering their judgment say, "We

32

are not called on to decide whether those who purchase stock transferred to them under *forged powers* might require the bank to confirm the purchase to them, and to pay them the dividends on such stocks, or whether their neglect to inquire into the authenticity of the power of attorney might not throw the loss on them that has been occasioned by the forgeries. *But, to prevent, as far as we can, the alarm an argument urged on behalf of the bank is likely to excite, we will say, that the bank cannot refuse to pay dividends to subsequent purchasers of such stocks.* If the bank should say to such subsequent purchasers, the persons of whom you bought were not legally possessed of the stocks they sold you, the answer would be, the bank in the books which the law requires them to keep, and for keeping which they are to receive a remuneration from the public, have registered these persons as the owners of these stocks, and the bank cannot be permitted to say that such persons were not the owners. *If this be not* law, who will purchase stock, or who can be certain that the stock which he holds belongs to him ?" Now, if this is sound as to government stock transferred by forged powers, what is to be said of corporation stocks, originally spurious, but transferred from time to time, through the agency of the corporation itself, to innocent purchasers ? Why certainly, as against the *bonâ fide* holders of such stock, the corporation would be estopped from going beyond its last certificate in any question arising between the corporation and such holder, touching the obligatory force of such certificate on the corporation. In our opinion, therefore, the complainants' title is good so far as they represent holders of spurious stock, whether such holders are the parties to whom it was issued originally, or whether they claim it by direct or remote succession from such original holders. Each of these different kinds of holders have an equal claim on the fraudulent agent who imposed the stock upon them; and all are represented in this suit by the Bank of Kentucky, under the Act of 1842; which law had for its object the consolidation of the rights and wrongs of all the sufferers under this vast fraud, so as to furnish a remedy co-extensive with the mischief done.

The tedious and uninviting road we have travelled, has brought us to the final question in the first branch of the cause, to wit, whether the Schuylkill Bank was or was not, in point of fact, the transfer agent of the Bank of Kentucky? The proofs on this subject are excessively voluminous. It will be our effort to condense in such a way, as to sufficiently show the basis of our deductions from them, without unnecessarily entering into details. Prepara-

tory to this, it will, however, be useful to invoke certain rules of evidence, applicable to corporation contracts, which must be our guides in the proper application of the testimony to the question for decision.   The artificial technicalities which in the earlier periods of the common law clogged corporations in entering into contracts, and embarrassed individuals in asserting them against these bodies, have given way before the advance of modern necessities and intelligence, so that few differences now exist in the media of proof in establishing a contract against a corporation, made in accordance with its charter, and a natural person.   It is now firmly established, that a corporation may be bound by a promise, expressed or implied, resulting from the acts of its authorized agents, although such authority be only by virtue of a corporate vote, unaccompanied with the corporate seal.   By the general rules of evidence, presumptions are continually made in cases of private persons, of acts even of the most solemn nature, where these acts are the natural results or necessary accompaniment of other circumstances.   The same presumptions are applicable to corporations.   Acts of corporations, which presuppose the existence of other acts, to make them legally operative, are presumptive proof of the latter.   In short, the acts of artificial persons afford the same presumptions as the acts of natural persons.   Each afford presumptions from acts done of what must have preceded them.   A vote of a corporation may be presumed from other acts, though there is no proof of such vote on the corporate record.   For, the omission of the corporation to record its own doings, cannot prejudice the rights of a party relying upon the good faith of an actual vote of the corporation.   Such presumptions are equally admissible, operating either for or against a corporation, the true question in such a case being, not which party is plaintiff or defendant, but whether the evidence is the best the nature of the case admits of, and leaves nothing behind in the possession or control of the party higher than secondary evidence.   The source from which these principles have been drawn, is the judgment of Mr. Justice Story, in the Bank, &c. *v.* Dandridge, 12 Wheaton, 64.   His language has been adopted, because, though it might be changed, it could not be improved.

Corporations are liable for the frauds and torts of their servants and agents, done in the course of their employment, in the same manner as individuals are responsible for the acts of their servants touching their business: Chestnut Hill Co. *v.* Rutter, 4 S. & R. 6.

With these guiding rules before us, we proceed to inquire into

the adequacy of the proofs produced by the complainants to esta-
blish the existence of this agency; and how far those proofs have
been repelled or explained away by the testimony of the defence.
We will first exhibit a synopsis of the material part of the com-
plainants' proofs, then of that of the defendants; and from a com-
parison of their relative forces, arrive at what we regard the true
conclusions of fact and law deducible from them.    The complain-
ants have proved, among others, these facts: The Bank of Ken-
tucky is a corporation, created for banking purposes by the legis-
lature of that state, with a capital of five millions of dollars divided
in fifty thousand shares, of which the state subscribed or reserved
twenty thousand shares.    The rest was subscribed by individuals.
A large portion of these individual subscriptions was obtained in
New York and Philadelphia, in which cities books were opened
pursuant to authority given by the charter.    The prerequisites of
the charter being complied with, in January 1835 the bank went
into operation.    On the 3d of February, 1835, the Directors, in
pursuance of the charter and by-laws of the bank, authorized the
President and Cashier to establish transfer agencies of its stock in
New York, Philadelphia, and New Orleans.    On the 6th of the
same month, John J. Jacob, President of the bank, addressed a let-
ter to Messrs. John S. Riddle and Sanderson Robert, of this city,
announcing this determination of the bank, enclosing a letter
describing the manner in which it was proposed to constitute this
agency.    A blank was left in this letter for the name of the agent,
which these gentlemen were authorized to fill up with that of the
*Schuylkill* or *Girard Bank*, whichever they should select as trans-
fer agent.    This letter was received by them about the 8th of
March, for we find them replying to it on the 9th, informing Mr.
Jacob, that "the groundwork was laid *with the Schuylkill Bank*,
which could be satisfactorily perfected on the recovery of the
Cashier, H. J. Levis, Esq., then seriously indisposed."    In this
reply, Messrs. Riddle and Robert suggest a change in the plan of
the agency, which it seems Mr. Jacob had anticipated by a second
letter, dated March 1, 1835, in which he proposed changing his
original scheme, so that "the agent in Philadelphia should, on the
surrender of certificates, be authorized to make transfers immedi-
ately from the bank to *his* books, and to issue his certificate as
agent to the transferee, advising the Cashier of the Bank of Ken-
tucky of such transfer, and forwarding surrendered certificates at
convenience."

On the 18th of March, 1835, *Levis*, the cashier of the Schuyl-

kill Bank, addressed the special letter of the case to Mr. Jacob. It is sufficiently important to be quoted at length.

"*Schuylkill Bank, March* 18*th,* 1835.

"*Dear Sir,*—Your favour of the 6th ult. (received per hands of Messrs. Riddle and Robert), tendering to this institution the transfer agency for Philadelphia, I have been obliged to delay answering until now, in consequence of severe indisposition, In accepting the agency for this city, I beg leave to offer you a sketch of the plan I have adopted for the transfer of stock, together with the form of the transfer warrant (a proof impression of which I enclose herewith), being the same as that which will be used by the Union Bank of New York.

"For the better accommodation of the stockholders here, the following is the system which has been adopted on opening the transfer books, viz.:

"The proprietors of all stock subscribed for in this city, are, on the surrender to us of the scrip receipts for instalments, credited on the stock ledger, and receive forthwith from this institution, as agent, a certificate for the amount, with power to transfer on our books as occasion may require. A stock account has been opened with your institution, which is debited with all stock placed to the credit of individuals, the amount of which you will be advised as soon as all the original scrip issued by the commissioners shall have been surrendered to us. By this means you will observe that the necessity of requiring the stockholders to wait until the original scrips and receipts shall reach you, and warrants be returned, before certificates can be issued to them, will be avoided. And at the same time, all the papers connected with the subscription in this city will remain within reach for reference if required (subject, however, to your orders). On transferring stock from one agency to another, the stockholder's account on our books will be closed, and the agency to which the warrant is addressed will be debited with the amount. Your directions with regard to forwarding a list of stockholders three calendar months previous to the annual election, will be duly complied with, as also the observance of the periods you mention for closing the books of transfer and transfer warrants, preparatory to declaring the dividends. As considerable labour will attend the transfer department, the customary charge of $500 per annum will be made for keeping the books, &c. &c.

"Collections will be made by us for your institution, on Pennsylvania, New Jersey, Delaware, Maryland, New York, and Boston,

Y

generally, free of charge. We have just been informed by Messrs.
Fellowes and Bell, that instructions are received at New York to
call in the third instalment on the 30th inst., and suggesting the
propriety of notifying stockholders here that the third instalment
will be received at the same time.

"We shall accordingly take measures to do so, although we are
without advice from you on the subject.

"I am, very respectfully,

"Your obedient servant,

"H. J. LEVIS, *Cashier*."

The forms accompanying this letter, by which the title of shares
could pass from one holder to another, were as follows :—

*No.*                                    *Bank of Kentucky.*

For value received, —— do hereby transfer and assign to ——
shares of the joint or capital stock of the Bank of Kentucky, upon
which —— instalment   amounting to —— dollars, have been paid.
In witness whereof —— have hereunto set —— hand this —— day
of —— 18

Signed in presence of

---

*No. of Shares.*                         *No. of Certificate.*

The Schuylkill Bank in the city of Philadelphia, acting as
agent for the Bank of Kentucky. Be it known, that —— enti-
tled to —— shares in the capital stock of the Bank of Ken-
tucky, transferable only in person, or by attorney, on the
books of the agency of said bank, at the Schuylkill Bank.
Witness the signature of the President or Cashier of the
Schuylkill Bank.

[left margin: Shares, $100 each.]   [right margin: Capital, $5,000,000.]

Philadelphia,                      18

---

*No.*                                    *Schuylkill Bank.*
Shares.              *Philadelphia,*                 183

To the Union Bank, New York, acting as agent of the Bank of
Kentucky. This is to certify, that —— the owner of —— shares
of the capital stock of the Bank of Kentucky, on which —— on
each share have been paid (as per certificate No. — dated —— issued
by this bank, as the agent for the said company), and that the said
—— has delivered to this Bank the aforesaid certificate, which has
been cancelled for the purpose of having the said —— shares placed
in —— name, and to —— credit, on the books of transfer, opened

by the said Bank of Kentucky, at the Union Bank in the city of New York.

In witness whereof, the Cashier of the Schuylkill Bank has hereunto affixed his signature, with the seal of the said bank, the day and date above named.

*Cashier.*

    The following minute of a resolution adopted by the Bank of Kentucky, shows the action of that bank on Mr. Levis's letter.

*Bank of Kentucky, Louisville, April* 2, 1835.

At a meeting of the Board of Directors, held this day, " A letter from H. J. Levis, Cashier, was presented and read, stating the terms upon which the Schuylkill Bank, of Philadelphia, would transact the agency business of this bank in that city, and the President was requested to answer the same, accepting the terms proposed."

In pursuance of the order of the board, Mr. Jacob addressed Mr. Levis, under date of the 3d April, 1835, and the following is a copy of so much of his letter as relates to the subject of transfer.

"*Bank of Kentucky, Louisville, April* 3, 1835.

"*Sir*—Your favour of the 18th ult. is received, from which I am gratified to learn that your suggestions with regard to the transfer of stock and keeping the transfer books have been anticipated, as you will see, if all my letters to you on that subject shall have gotten to hand.

" The charge made by you for transacting our business in the transfer department, has been (for reasons assigned by you) accepted of by our Board of Directors."

H. J. LEVIS, Esq., *Cashier Schuylkill Bank.*

The letter of the 18th of March was written by D. M. Robinson, a clerk of the Schuylkill Bank, and signed by Mr. Levis; was copied in the regular letter book of the bank, a book open to all the Directors, and where it now is found; and if the business of this bank was regularly done, was laid before the board. On the 16th day of March, 1835, two days before this letter bears date, transfer books of the stock of the Bank of Kentucky were opened at the Schuylkill Bank ; a desk was prepared for the despatch of the business, over which was publicly inscribed " Transfer Desk of the Bank of Kentucky." On the same day, the first certificate of Kentucky Bank stock was issued by Mr. Meredith, *President of the Schuylkill*

*Bank,* a gentleman of unsullied integrity. And between the 18th of March and the 28th of April, 1835, a number of certificates of the same kind issued, signed by the same respectable gentleman, some having the seal of the bank, and all headed "Schuylkill Bank, acting as agent of the Bank of Kentucky." The first forty-six transfer warrants issued to the Union Bank of New York, the transfer agent of the Bank of Kentucky in that city, were signed by Mr. Meredith, and attested by the seal of the Schuylkill Bank. Each of these transfer warrants asserts on its face the Schuylkill Bank to be the agent of the Bank of Kentucky. The whole number of certificates of the stock of the Bank of Kentucky, purporting to have been issued by the Schuylkill Bank, acting as its agent, was 2653; of transfer warrants to the Bank of Kentucky 99; and of transfer warrants to the Union Bank of New York, 373: making an aggregate of 3125 official documents, in which the community were informed through the signatures of its officers, and frequently by its seal, that the Schuylkill Bank was the agent of the Bank of Kentucky. Of these, Mr. Meredith signed 399 certificates; four transfer warrants to the Bank of Kentucky; and 47 warrants to the New York agency: in all 450 signatures. The seal of the Schuylkill Bank was affixed to 16 certificates of stock; to 293 transfer warrants to the New York agency, and to 25 transfer warrants to the Bank of Kentucky: in all 318 seals. The Philadelphia agency received 324 transfer warrants from the New York agency, and 98 from the Bank of Kentucky: in all 422. The terms of the certificates require only the signature of the president or cashier of the agent bank; those of the transfer warrants require the signature of the cashier and the seal of the agent bank. And this accounts for the few seals annexed to certificates. Some of the Directors of the Schuylkill Bank, during these transactions, which lasted near five years, were purchasers of the stock of the Bank of Kentucky, through the Philadelphia agency, and must have seen in their own certificates the fact asserted, that the Schuylkill Bank was acting as agent of the Bank of Kentucky. During the connexion between these banks, an extensive correspondence took place between them, principally through their cashiers. But among the letters produced are eighteen from Mr. Meredith, in which he refers to the business transacting by the Schuylkill Bank for the Bank of Kentucky, as collecting, dividend, and transfer agent. In different interviews had between Mr. Meredith and Messrs. Riddle and Fellowes, Directors of the Bank of Kentucky, nothing like any dissent or denial of the Schuylkill Bank's agency was intimated by

him. Numerous books connected with the agency were kept at the Schuylkill Bank, viz. dividend books, stock transfer books, transfer warrant books, &c. These were under the supervision of a special clerk employed for the purpose, but frequently the regular clerks of the Schuylkill Bank made entries in them. The dividends of the Bank of Kentucky were paid by the same clerk who paid the dividends of the Schuylkill Bank.

For the first six months of the agency, the Bank of Kentucky was charged $250 clerk-hire, according to the proposal of March 18, 1835. After that time, the charge was discontinued. This arose from the following transaction, which presents a new and important feature in the case. A committee of the Bank of Kentucky, consisting of Messrs. Riddle, Fellowes, and Garvin, were in Philadelphia, in August, 1835, on special business of the bank. While here, Mr. Riddle ascertained that the transfer agencies of other western banks were conducted in some instances free of charge. Feeling it his duty to the Bank of Kentucky to rid it of the expense of $500 per annum clerk-hire, then paid to the Schuylkill Bank for conducting its transfer agency, he addressed the following communication to the bank through its Cashier:—

"Memorandum of terms proposed for the transaction of business between the Bank of Kentucky and the Schuylkill Bank of Philadelphia:—

THE SCHUYLKILL BANK.

"1st. To keep the 'Transfer Books' of the Bank of Kentucky, and attend to all matters appertaining to transfers, free of charge.

"2d. To collect instalments of the stock of the Bank of Kentucky, pay dividends, and, if required, pay interest on the bonds of the state of Kentucky, issued to the Bank of Kentucky, free of charge.

"3d. To collect bills or notes, payable in Philadelphia, New York, Boston, Baltimore, and towns in the interior of Pennsylvania, New Jersey, and Delaware, and place the amount of collections to the credit of the Bank of Kentucky at par, free of charge, except in cases where the Schuylkill Bank is charged for collecting —in such cases the Bank of Kentucky to be charged the same amount only.

"4th. To redeem the post notes of the Bank of Kentucky, payable at the Schuylkill Bank, and to pay the checks of the bank and her branches, free of charge.

"5th. To allow the Bank of Kentucky to overdraw her account to

33                                    Y 2

the extent of one hundred and fifty thousand dollars,—interest to be charged at the rate of six per cent. on the amount of such over-drafts until refunded.

" The Bank of Kentucky, however, not to avail herself of this privilege, unless in cases of emergency, when necessary to protect her credit, or prevent great loss.

THE BANK OF KENTUCKY.

" 1st. To collect for the Schuylkill Bank, free of charge, bills or notes payable at Louisville, and those towns in the interior where her branches are established, and place the amount of such collections to the credit of the Schuylkill Bank at par.

" 2d. To collect all bills or notes, for the Schuylkill Bank, payable at any of the Western cities or towns where banks are located, and place the amount of such collections to the credit of the Schuylkill Bank at par, and free of charge, save in such cases as the Bank of Kentucky may be charged, and in these the Schuylkill Bank to be charged the same.

" These terms to continue during the pleasure of the parties, and until at least 60 days' notice shall have been given by one party desiring to rescind."

To which terms or proposals in writing, was added a letter from William Riddle, in the words following, to wit:—

H. J. LEVIS, Esq., *Cashier of Schuylkill Bank*.

" *Dear Sir*,—I hand annexed a memorandum of terms, which the Committee of the Board of Directors of the Bank of Kentucky propose for the government of its future transactions with the Schuylkill Bank.

" They are, I believe, fully in accordance with the views of the board of the Bank of Kentucky, and appear to me to be mutually advantageous.

" You will please submit this memorandum to your board, and advise me of their decision as early as convenient—if the terms are acceded to, I will lay them before the board of the Bank of Kentucky, for approval.

　　　　　　　" Very respectfully,
　　　　　　　　　" Your obedient servant,
　　　　　　　　　　　" WILLIAM RIDDLE.
*Philadelphia, August* 19, 1835."

These propositions, Mr. Riddle says, he understood from the officers of the Schuylkill Bank, were acceded to *by the bank*.　On the

30th of September, 1835, Levis wrote to the Cashier of the Bank of Kentucky, informing him that on that day their account was charged with $250, for six months' salary to clerk, for keeping their transfer books, according to the agreement of the previous March. But that "with the *present arrangement* no further charge would be made for such service." The "present arrangement" here spoken of, can refer to nothing but the Riddle arrangement of the previous August. No such charge was ever afterwards made. There is some discrepancy in the testimony as to whether Mr. Riddle, in proposing this arrangement, acted with authority from the Bank of Kentucky. But it is satisfactorily shown, that it was subsequently adopted by that bank.

That the Bank of Kentucky considered its arrangements as made with the Schuylkill Bank, and not its Cashier individually, is abundantly proved. The letter of February 6, 1835, from Mr. Jacob to Messrs. Riddle and Robert, shows it was the Schuylkill or Girard Bank he desired to deal with, not any individual. The letter of appointment, which they were to fill up, and hand to the selected agent, also shows that it was an "institution" they were to contract with. The reply of Levis, as Cashier, accepting the agency, dated March 18, 1835, speaks of it as tendered to the "institution." The resolution of the Directors of the Bank of Kentucky of the 2d of April, 1835, accepts the terms "upon which the Schuylkill Bank of Philadelphia will transact the business of the agency of the bank in that city." The testimony of all the officials of the Bank of Kentucky examined, concurs in showing that they regarded the Schuylkill Bank as the Philadelphia agent. The Union Bank of New York so appreciated the relation of the Schuylkill Bank. This is shown by the testimony of its officers. These relations between these banks continued until Dec. 1839, when the removal of the agency to the Bank of the United States produced the final explosion of the Schuylkill Bank.

Such seem to us to be the essentials of the testimony through which the complainants suppose they have established in the affirmative, the vital position that the Schuylkill Bank was their transfer agent. If called to decide upon the question of the existence of this agency on this testimony, the result would necessarily be a determination that the Schuylkill Bank was, from the 18th day of March, 1835, to December, 1839, the transfer agent of the Bank of Kentucky. It is true, we have in it no direct evidence of the acceptance of this agency by a formal vote of the Board of Directors of the Schuylkill Bank. But we have multiplied acts which

presuppose the fact of such acceptance. And although the re-
corded vote of a corporation forms most cogent evidence to charge
it with a contract, still we have seen it is not the only evidence
by which it may be so charged. Direct and positive testimony is
most desirable in the maintenance of any position of fact assumed
in a Court of justice; but where that does not exist, the party
seeking to establish a contract, whether against an individual or a
corporation, must of necessity resort to circumstances, to presump-
tions from facts proved, or all and every species of secondary evi-
dence in his power. From the inception to the termination of the
relations between these banks, as shown by the complainants' proof,
there appears a connected series of acts and circumstances tending
to establish the fact of the existence of this agency as charged in
the complainants' bill. That these establish a *primâ facie* case,
we think can hardly be disputed.

We now approach the second head of our present investigation.
How is this *primâ facie case* met by the defendants? It is alleged
that the Schuylkill Bank never agreed to act as transfer agent of
the Bank of Kentucky; never did so in point of fact; that the
complainants' Philadelphia transfer agent was Hosea J. Levis, in
his individual capacity; and that with him as such, the Schuylkill
Bank had no connexion.

To maintain the position that the bank never entered into the
alleged contract of March 18, 1835, the minutes of the corporation
have been produced for the months of February, March, and April,
1835. On these nothing appears, indicating in any way that such
business ever came before the board. These minutes have been
objected to, on the ground that they are kept on loose and de-
tached sheets of paper, and are not the "fair and regular entries
of their proceedings, kept in a book provided for that purpose,"
required by the charter and by-laws of the bank. This irregularity
is accounted for by the fact, that during this period, the Cashier,
whose duty it was to keep these minutes, was disqualified from
doing so by severe indisposition. Admitting the sufficiency of this
excuse, it is at least true, that in such hasty and careless docu-
ments, we can hardly expect to find much accuracy in the history
of the business of the board. They are, however, still the minutes
of the board; and, as far as that fact is of value to the defence,
nothing appears on them showing any action on the subject of this
agency at the time it is said to have been entered into. Six of the
Directors of 1835 were examined, and their depositions are before
us. One of these, Mr. Ford, states that he knows of no authority

ever having been given to Mr. Levis to write the letter of the 18th of March, 1835 ; and that he does not remember to have ever seen Mr. Jacob's letter of Feb. 6, 1835, which is that containing the first proposal for the establishment of the Philadelphia agency. Another Director, Mr. Symington, says he never knew of the receipt of such a letter as that of Mr. Jacob, or any authority given to Mr. Levis to write his answer of the 18th of March; and that he does not recollect any authority, while he was in the board, to Levis to write any letter assuming for the Schuylkill Bank the agency of the Bank of Kentucky. A third, Mr. Montgomery, states that he *has no recollection* of ever having seen or heard of Jacob's letter of the 6th of February, 1835, nor of Levis's reply of March 18, 1835; nor of ever having heard of any authority given to Levis to write such a letter. That he has no recollection of any proposition being made on the part of the Bank of Kentucky with regard to transfers only : the general business which takes place between banks, *as the collecting drafts*, drawing checks, and so on, he *does recollect*. And that he never considered the bank as the agent of the Bank of Kentucky for transfers. He adds he has not a retentive memory, and *speaks to the best of his knowledge*. A fourth, Mr. Edward Smith, says, he has no recollection of Mr. Jacob's letter being presented to the board, nor of any such letter as Levis's reply to it being authorized by the board. He adds, he was *not a regular attendant at the board*. A fifth, Mr. Breck, says, he never saw Jacob's letter of the 6th of February, nor ever knew or heard, *to the best of his recollection*, of any authority given to Levis, or any one else, to write the reply of March 18, 1835: nor did he ever hear of any such letter being written by any officer of the bank. A sixth, Mr. Chapron, says he does not recollect that he ever saw Mr. Jacob's letter; that it was never communicated to him as a Director ; that he never knew or heard of any authority given to any officer to answer it; and that he never heard or knew that a contract of transfer agency existed between the Schuylkill and Kentucky Banks. Henry Slack, a clerk in the Schuylkill Bank, testifies, that when Mr. Jacob's letter of Feb. 6 was received from Mr. Robert, he, Slack, carried it to Levis, who was at home, sick; and that on reading it, Mr. Levis ordered him to prepare a desk for the reception of the instalments of the Kentucky Bank. This must have been about the 8th of March, as Robert replied to Jacob on the 9th. Before intimating the deductions drawn by us from this testimony, the Court will proceed to review the defendants' proofs in reference to

the Riddle proposal of the 19th of August, 1835, from which the permanent arrangement for this agency dates. The communication of Mr. Riddle was made on the 21st of August, to the *Directors* of the Schuylkill Bank. The minutes of that day show that the President, Mr. Meredith, and Messrs. Symington, Ford, Montgomery, Chapron, and Boggs, Directors, were present, being one less than a quorum of the board, for any other purpose than discounting. On these minutes, as transcribed, appears the following entry:—"It was moved and seconded, that the terms proposed by Mr. W. Riddle, on behalf of the Bank of Kentucky, be acceded to." On the rough minutes, from which the fair minutes of this meeting have been copied, the words seconded have been written over an erasure, which the complainants' counsel insist reads "carried." It is to be regretted, that minutes so important should exhibit an erasure in a part so material; yet it may have been made with entire good faith, and truly represent what actually took place. The same Directors examined in reference to proposal of Feb. 6, 1835, were also examined as to that made by Mr. Riddle. Mr. Ford, who was present at the meeting of the 21st of August, says, he knows nothing in relation to it independent of the minutes. He adds, that until the day his examination was taken, he *never saw* the proposition of Mr. Riddle. Mr. Symington, another Director, put down as present in the minutes of August 21, says, when shown on his examination, the letter and proposal of Mr. Riddle, that *he does not recollect* any proposition from the Bank of Kentucky to the Schuylkill Bank, *nor does he recollect* ever to have seen Riddle's proposals while he was a Director of the bank. Mr. Montgomery, another Director, also noted as present at this meeting, says, he *has no recollection* of ever having seen the Riddle letter and proposals. Mr. Chapron, also noted as present, says he never saw Riddle's letter until shown him at his examination, and does not recollect of its ever having been communicated to him.

To the absence of a recorded vote on the minutes of the Directors of this bank, showing the acceptance of this agency, we do not attach much importance. The question for solution is not the existence or non-existence of such a minute, but whether the corporation of the Schuylkill Bank entered into a contract with the Bank of Kentucky, in March and August, 1835, to execute the duties of Philadelphia transfer agent for the latter. Although a corporate vote to that effect, found on the corporation minutes of the Schuylkill Bank, would be irrefragable evidence of the fact,

the absence of such a minute proves nothing, *per se*, against its existence.   As is said by Judge Story, in The Bank *v.* Dandridge, "the omission of a corporation to record its own doings cannot prejudice the rights of third persons relying upon the good faith of an actual vote of the corporation."   Such an omission may embarrass the action of the party seeking to establish the asserted contract against the corporation, but can produce no other result. It only renders it necessary to seek for testimony elsewhere.   In this connexion, the fact is apposite, that the only written evidence of the agency of the Union Bank in New York is found in the Cashier's letter of acceptance of it on the minute book of that bank.   And although a vote of the Directors of the bank was taken on the acceptance, there is no record of it on the minutes of the board.   A curious coincidence of circumstance in the origin of the two agencies, showing how little importance is to be attached to corporation minutes in comparison with corporation acts.

The testimony of the Directors of 1835, in which they disclaim any present recollection of the existence of such a contract as that charged, has somewhat more force.   But ought it to outweigh the proofs adduced by the complainants?   Such testimony is but the uncertain recollection of witnesses, detailing a transaction occurring some nine years before their examinations, and which took place amid the varied business of a large institution.   The value of such testimony may be estimated from the fact, that four of the witnesses, noted as present on the 21st of August, 1835, have now no recollection of the fact that this proposition was then actually laid before them sitting at the board.   And yet, who can look at the minutes of August 21, 1835, and doubt that the Riddle proposition was so submitted? though, amid the mists of time, and the confusion of events occurring to this unfortunate bank, these gentlemen have most naturally lost sight of it.

There are two facts in the cause which specially corroborate the minutes.   The first is found in the testimony of Mr. Riddle, who says, that after his propositions were submitted, the officers of the bank told him they were adopted; the second, in the fact, that on the 30th of the ensuing September, Levis wrote, admitting the new arrangement, and abandoning the charge for clerk-hire for the future.   The integrity and candour of these witnesses, and their purity of character, we do not question.   But they are men, with mere human faculties, and their mere recollections must be overbalanced by testimony of greater certainty and force; and with such testimony this cause is replete.   It is said, that the arrangement

of March 18, 1835, was a personal affair of H. J. Levis; and yet, we see, that when the proposal of the 6th of February, contained in Mr. Jacob's letter, was first brought to the bank, Levis was at home severely ill. That it was acted upon in the bank, as if adopted on the 16th of March, by the President's issue of stock certificates, reciting the very fact in dispute, that the Schuylkill Bank was the agent of the Bank of Kentucky; Levis being still sick and absent. That the repudiated letter of Levis, of March 18th, 1835, though signed by him, while confined to his house by illness, is in the handwriting of a clerk of the bank, and was spread at length on its common letter book, open to all the Directors. And that for some time after, and until Levis was able to resume his place, the business of the transfer agency was carried on in the bank through the President, Mr. Meredith.

During this same period, the transfer books were prepared and opened: the desk with its conspicuous designation was set up; and the whole machinery of the agency established, whose crash brought such wide-spread ruin upon the unfortunate stockholders of this institution. Standing by themselves, these cotemporaneous *acts*, proved as they are beyond doubt or cavil, ought to overbalance the remote reminiscences of these Directors, respectable as they are. But when associated with a long train of subsequent events, all tending in the same direction; when we find the defendants' confidential executive officers actively prosecuting this agency for near five years in the open view of the public; when we find them scattering broadcast over the country, certificates of the stock of the Bank of Kentucky by thousands, asserting on their face the fact of such agency, issued from their banking house, signed always by one of their chief officers, and frequently solemnized by their official seal; the force of the proof against them becomes irresistible. These observations apply with equal force to the proofs of the agreements of the 18th of March, and 21st of August, 1835. But the latter is most directly brought home to this directory. Their own minutes show, that Riddle's propositions were submitted to them when assembled in corporate meeting. And these propositions distinctly and exclusively contemplated an arrangement between the *banks*. That was the moment for rejecting them or any part of them deemed inadmissible. Was this done? It was not. If not formally concurred in, they met a favourable reception; a reception fairly leading to the idea that subsequently, by general consent, they were acquiesced in. When we regard the events which followed, the Court is bound to presume such to be the fact, so far as third persons are to be

affected by them: M'Gargle *v.* The Hazleton Coal Co., 5 W. & S. 436. "The acts of artificial persons," say the Court in The Bank *v.* Dandridge, "afford the same presumptions as the acts of natural persons. Each affords *presumptions from acts done, of what must have preceded them as matters of right or matters of duty.*" What more solemn duty could have been imposed on this directory, before they permitted anything to be done in pursuance of these proposals, than to accept or reject them? Were the acts done subsequent to their reception most consonant with acceptance or rejection? This question is readily answered by their simple enumeration. The first occurrence after the meeting of August 21, 1835, was the announcement to Mr. Riddle, by the Schuylkill Bank officers, of the acceptance of his propositions by the board. The next was the official communication of this result to the Bank of Kentucky, by Mr. Levis's letter of the 30th of September, 1835. In this letter, it will be remembered, he announces that the charge of $500 per annum clerk-hire, stipulated for in the original arrangement of March, 1835, was "under the present arrangement" to be discontinued. Then followed the acts and doings of the Schuylkill Bank in execution of the agency, which have been already observed upon. The testimony of the Directors examined in reference to their knowledge as to the Riddle arrangement, amounts substantially to this: that all present on the 21st of August, 1835, when it was submitted, except Mr. Boggs, who was not examined, and Mr. Meredith, who is dead, unite in expressing their want of recollection as to the occurrence of any such circumstance. But, besides the general incertitude of such testimony, its effect is weakened by the minutes of that day, which show that the proposal was made and considered. In the case of a third person, like the Bank of Kentucky, how can the *de facto* exercise for years of the functions of this agency by this corporation through its officers, be met by such testimony? Surely it was the business of this directory to know the matters, daily and for years, transpiring in their own bank, and under their own continuous observation. Third persons cannot enter into the bank parlour; they cannot open the minute and letter books of the corporation; they must estimate the existence of a corporate contract from the prevalence of the concomitants which usually attend such a contract when existent. The general public and the complainants had the right to assume that these Directors did their duty; that they supervised their offices; read their own letter book; knew that in thousands of instances their corporation was exhibited to the world, in all its most solemn forms of expression, as the agent

34     Z

of the Bank of Kentucky. The law will presume the performance of such obvious duties, and the knowledge of such flagrant facts, so far as respects third persons dealing with the corporation. Any other doctrine would make corporations of this kind public evils.

The effort to prove Levis to have been the transfer agent of the Bank of Kentucky, if successful, would of consequence relieve the Schuylkill Bank from the liabilities sought to be visited on them by the complainants. For, as the complainants had but one Philadelphia transfer agent, if Levis was such, the Schuylkill Bank was not. The circumstances on which the Schuylkill Bank relies as establishing Levis to have been such agent, are, in our opinion, utterly inadequate to nullify the clearer proofs of its own corporate agency. That Levis was the original agent of the Bank of Kentucky for the receipt of instalments from original subscribers, and confided in as such by that bank, does not affect the question whether a subsequent contract for the same and different purposes was not entered into between the Bank of Kentucky and the Schuylkill Bank. The fact that Levis, after the 18th of March, 1835, affected still to be the agent of the Bank of Kentucky for the receipt of its instalments, payment of its dividends, and conducting its transfers, all may and do prove *his* egotism, but cannot shake the facts which make the Schuylkill Bank the true agent. To the complainants these things were *res inter alios actæ;* matters with which they had no connexion; which they had no means of knowing, or obligations to notice. They were for the correction of the defendants, whose organ it was that played these fantastic tricks. Nor do we attach any importance to the circumstance, that anonymous writers, calling themselves "stockholders," "frightened stockholders," and "Philadelphia stockholders," towards the close of this agency threw out hints to the Bank of Kentucky, that all was not right with its Philadelphia agent. Nor that some bolder spirits expressed their doubts and fears more openly. Nor that the Kentucky Bank did not change its agent more promptly when its suspicions ought to have been roused by the circumstances enumerated in the proofs. If they were in any way bound to supervise the actings and doing of the executive officer of the Schuylkill Bank, from their remote position, how much more intense was this obligation on the home directory of that bank, to see that his acts did harm to none of whom they were the trustees. From them it comes with a bad grace to complain, that others did not perform duties which the law imposed on them; or to question their liabilities to the complainants, because they confided too long and too trustingly to them. In the course

pursued by the Directors of the Bank of Kentucky, when threatened with the heavy calamity which subsequently came upon their bank, we see nothing to censure; nothing but that cautious and deliberate action which the wise and prudent, charged with the management of important affairs, always pursue. Rashness or precipitation in them might have ruined the credit of the Schuylkill Bank, if innocently impugned, and through that means affected themselves.

Required by the constitution of the Court to decide the facts as well as the law of the case, we must, of necessity, if a conflict of testimony exists, weigh and compare it in order to ascertain where the true preponderance lies. In the performance of this delicate duty, the ordinary course of human action, the personal relations and means of knowledge of antagonist witnesses, the general consistency in all the leading elements of an investigation, are to be carefully invoked. These all indicate, in this case, the superior value of the complainants' proofs, and compel us, without intending to disparage those of the defendants, to pronounce that the Schuylkill Bank of Philadelphia was, from the 18th of March, 1835, to the 16th of December, 1839, the transfer agent of the Bank of Kentucky; and, as such, responsible for every malversation committed by its organic functionaries in the execution of such agency, to the prejudice of its principal. If differences of opinion should exist between disinterested observers of all the facts of this case, as to the question, whether the Schuylkill Bank, in its corporate capacity, and through its lawful corporate agents, assumed originally this agency; none, we think, can prevail on the question, whether the corporation did not ratify and confirm an agency assumed for it by its organic officers. Of the original assumption of the agency by the corporation, the testimony is strong and convincing; but of the subsequent ratification of the contract, as a corporate contract, by whomsoever originally assumed, it is absolutely overwhelming. Slight circumstances and small matters will sometimes suffice to raise the presumption of a ratification. But, wherever the acts and conduct of the principal are inconsistent with any other supposition, the presumption of course becomes far more violent and conclusive: Story on Agency, § 253; Paley by Lloyd, 171, 172; Episcopal Charity Society *v.* Episcopal Church, 1 Pick. 372. Long acquiescence, also, without objection, and even the silence of the principal, will, in many cases, amount to a *conclusive presumption* of the ratification of an unauthorized act, especially when such acquiescence is not otherwise to be accounted for; or such silence is either con-

trary to the duty of the principal or *has* a tendency to mislead the agent: Story on Agency, § 255.

Of the fact that spurious and factitious stock of the Bank of Kentucky, in nominal value equalling a million and a quarter of dollars, issued from the Schuylkill Bank, signed by its officers, under its seal, professing to act as transfer agent of the Bank of Kentucky in such fraudulent issues, no doubt exists. That Hosea J. Levis was the sole actor in these atrocities, is of no further importance than this, that this fact relieves all the rest of the corporation agents from *moral* responsibility on the subject. The legal responsibility of the corporation remains the same as if the fraud was more extensively ramified.

It is equally certain, that, to almost the entire amount of this vast liability, the Bank of Kentucky, under the authority of the legislature of that state, has faithfully responded. And that of the unsatisfied holders of this spurious stock, the complainants are made the representatives, by the wise and just law of this Commonwealth.

It follows, that our decree must be pronounced against the Schuylkill Bank, requiring that corporation to indemnify the Bank of Kentucky, as well in its own right, as representing the unsatisfied holders of spurious stock, for all losses sustained by the unfaithful conduct of this agency. For the purpose of ascertaining the extent of such indemnity, the usual reference must be made.

In respect to the second head of the case, to wit, whether, supposing Levis to have been the true agent of the complainants, the defendants are not bound to pay to the complainants the great amount received by him from the proceeds of the sale of spurious stock, and either deposited in, or used for the purposes of the Schuylkill Bank, it is unnecessary for us to decide. The decision that the Schuylkill Bank was the transfer agent of the Bank of Kentucky, and responsible for all the results of the maladministration of this trust, supersedes the necessity of such an inquiry. This judgment has been already too much elaborated, to justify the Court in entering into a matter the determination of which is not required.

> This cause came on to be heard at this term (viz. September Term, 1845), and was argued by counsel, and therefore upon consideration thereof it was ordered, adjudged, and decreed, that the said the Schuylkill Bank, in the city of Philadelphia, and Hosea J. Levis, pay unto the said complainants, the President, Directors, and Company

of the Bank of Kentucky, one million one hundred and eighty-four thousand seven hundred and thirty-eight dollars ($1,184,738), as a just indemnity for the loss, detriment, and damage to which they, the said complainants, and the holders of the stock hereinafter mentioned, have been put or have suffered by reason of the fraudulent issue of thirteen thousand one hundred and eighty-five (13,185) shares of the stock of the said the President, Directors, and Company of the Bank of Kentucky, by the said the Schuylkill Bank in the city of Philadelphia, while transfer agent of the said the President, Directors, and Company of the Bank of Kentucky, by, with, and through the procurement, knowledge, and assistance of the said Hosea J. Levis, and which said shares of the said stock, the said the President, Directors, and Company of the Bank of Kentucky, have either assumed or are entitled to represent by the Act of Assembly in such case made and provided, and that the said defendants, the Schuylkill Bank in the city of Philadelphia, and Hosea J. Levis, do further pay unto the said President, Directors and Company of the Bank of Kentucky the costs of this suit.(*a*)

(*a*) An appeal was taken from this decree to the Supreme Court, and the judgment of the Court below affirmed in January, 1849.